[No. 16561–5–I.   Division One.   March 30, 1987.]

DEYONG MANAGEMENT, LTD., *Appellant*, v. JOHN I.
PREVIS, ET AL, *Respondents.*

*Camille Taylor Ralston* and *Montgomery, Purdue, Blankinship & Austin,* for appellant.

*Murray Anderson* and *Anderson & Anderson,* for respondents.

DURHAM, J.*—Deyong Management, Ltd., is a creditor of Randy Previs. Deyong brought this action against Randy's parents, John Previs and Lola Previs, claiming that they had participated in a series of fraudulent conveyances of property for the purpose of concealing Randy's assets from his creditors. Deyong sought a money judgment from John and Lola as transferees of the fraudulent conveyances. The trial court dismissed Deyong's action. We now reverse the trial court.

Deyong obtained a judgment for over $84,000 against Randy on November 26, 1979 in Kittitas County Superior Court. An abstract of this judgment was filed in Jefferson County on January 30, 1980. On February 25, 1980, Randy filed a petition in the United States Bankruptcy Court for the Western District of Washington, for reorganization under Chapter 11. That bankruptcy case was still pending at the time of trial in the present action in February 1985.

In this action, which began in October 1982, Deyong claimed that beginning in 1979, Randy's parents, John and Lola, participated in a number of fraudulent conveyances in order to conceal Randy's assets from his creditors. Deyong's claims involve the following transactions.

Dabob I. On September 6, 1979, Randy executed, acknowledged and delivered to his father, John, a quitclaim deed to certain real property located in Jefferson County known as "Dabob I". The conveyance was a deed of gift and John paid no consideration for the property. The trial

---

*This appeal was heard by a Supreme Court Justice, a Superior Court Judge, and a retired Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

court found that John and Lola knew that the purpose of the conveyance was to hold the property safe from Randy's creditors or until Randy overcame his financial difficulties. The deed was recorded in Jefferson County on October 23, 1979.

On October 6, 1980, in response to a letter of demand from the trustee of Randy's bankruptcy estate, John reconveyed Dabob I to Randy by quitclaim deed. This deed was recorded in Jefferson County by the trustee in bankruptcy on October 16, 1980. Randy's bankruptcy estate sold Dabob I on or about August 12, 1982, for a total price of $113,183.91, out of which the estate received cash in the amount of $23,815.90 and a note secured by a deed of trust on the property in the amount of $27,458.48.

In Randy's bankruptcy proceeding, Deyong attempted to obtain recognition of a judgment lien on the proceeds of the sale of Dabob I, growing out of the judgment it had against Randy. The trustee asserted that the bankruptcy estate was entitled to those funds free and clear of Deyong's claims. The bankruptcy court ruled in favor of the trustee, holding that the trustee was subrogated to the position of John and Lola, the fraudulent transferees of the property, negating Deyong's alleged judgment lien recorded subsequent to the recording of the fraudulent transfer, pursuant to the bankruptcy code, 11 U.S.C § 551. It further held that even if it were to conclude that 11 U.S.C. § 551 did not give the trustee priority over judgment liens attaching subsequent to a fraudulent transfer, the trustee would still prevail in this action because Deyong had not obtained a lien against Dabob I. According to the bankruptcy court's analysis, as a judgment creditor subsequent to the fraudulent conveyance of Dabob I, Deyong could not acquire a lien on Dabob I since no interest in the property remained in Randy upon which a judgment lien could attach. *See In re Previs,* 31 Bankr. 208, 211 (Bankr. W.D. Wash. 1983).

At trial in the present case, Mr. Bush, the attorney for the trustee in bankruptcy, testified that if the bankruptcy court had ruled in favor of Deyong, the proceeds of the sale

of Dabob I would have been subject to Deyong's judgment lien and would have been disbursed to it.

The Brute. On September 6, 1979, Randy also executed, acknowledged and delivered to John a bill of sale to a yacht known as "The Brute". The bill of sale stated that is was for collateral purposes only. On February 15, 1980, John executed a bill of sale transferring The Brute back to Randy. Both bills of sale stated a consideration of $185,000 borrowed and returned, but no consideration passed either way between John and Randy. On February 20, 1980, Randy sold The Brute and received a check for $59,406.07 in proceeds from the sale.

Dabob II. On February 20, 1980, Randy gave John $20,000 from the proceeds of the sale of The Brute for the purpose of purchasing certain real property in Jefferson County known as Dabob II. On February 26, 1980, Randy gave John an additional $5,000 from the proceeds of the sale of The Brute to be used to close the Dabob II purchase, if needed. On March 17, 1980, John purchased Dabob II on a real estate contract. John paid $20,400 toward the purchase price out of the proceeds from the sale of The Brute which he had accepted from Randy. The remaining $4,600 of The Brute proceeds which Randy had given John was returned by John to Randy in installments, with the last installment on June 26, 1980.

On January 28, 1981, John and Lola transferred the vendee's interest in Dabob II to Randy's wife, Katy Previs, by quitclaim deed. At trial, Mr. Bush testified that in the course of his work in Randy's bankruptcy proceeding, he investigated the value of Dabob II and found that after Katy had acquired title, liens had been made against the property which appeared to equal or exceed the value of the real estate. He concluded that the property had no value to the bankruptcy estate, and therefore, the estate abandoned it.

The present action began in October 1982. Deyong sought a money judgment against John and Lola, as grantees of the fraudulent conveyances. The trial court con-

cluded that the transfers by Randy to John and Lola were fraudulent conveyances. It determined, however, that neither John nor Lola obtained any monetary benefit from the transactions, and that none of the conveyances were transfers that put the properties conveyed beyond the reach of Deyong as a creditor of Randy. It dismissed Deyong's complaint.

The question on this appeal is if Deyong, as Randy's creditor, may recover a money judgment from John and Lola, as transferees of properties fraudulently conveyed to them by Randy. Essentially, Deyong contends that when a plaintiff creditor proves that a defendant knowingly accepted fraudulently conveyed assets with the intent to assist the transferor in evading his creditors, and thereby placed such assets beyond the creditor's reach, then the transferee should be held personally liable to the creditor for the value of the assets placed beyond the creditor's reach, up to the amount owed to the creditor.

Our state has adopted the Uniform Fraudulent Conveyance Act, RCW 19.40, which provides that a creditor whose claim has matured has the following rights when a fraudulent conveyance has occurred:

> Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser,
> (a) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or
> (b) Disregard the conveyance and attach or levy execution upon the property conveyed.

RCW 19.40.090(1). The act does not address a creditor's right to obtain a money judgment from the transferee of a fraudulent conveyance. Nevertheless, it provides:

> In any case not provided for in this chapter the rules of law and equity including the law merchant, and in particular the rules relating to the law of principal and agent, and the effect of fraud, misrepresentation, duress

or coercion, mistake, bankruptcy or other invalidating cause shall govern.

RCW 19.40.110. This language indicates that creditors may also look to the common law for other remedies. *See Tort Liability for Fraudulent Conveyances,* 19 Stan. L. Rev. 636, 641 (1967) (Uniform Fraudulent Conveyance Act not intended to preclude other remedies).

No Washington appellate court has decided if the transferee of a fraudulent conveyance may be held personally liable to the transferor's creditors. However, courts in other states that have adopted the Uniform Fraudulent Conveyance Act have held that a money judgment may be entered against the transferee under certain conditions. In *Damazo v. Wahby,* 269 Md. 252, 256–57, 305 A.2d 138 (1973), the court held that if the property fraudulently conveyed has been disposed of, has depreciated in value, or cannot be reached, the defrauded creditor may recover a money judgment from the person to whom the transfer was wrongfully made, and through whose hands the property passed. The court in *Damazo* rejected the argument that because the Uniform Fraudulent Conveyance Act provided the remedies of setting aside the conveyance or executing upon the property conveyed, it did not contemplate the entry of an in personam judgment against the transferee. The court reasoned that the remedies established by the act were simply alternatives to the legal and equitable remedies already available to a creditor, noting that the underlying objective of the act was to enhance, not impair, a creditor's remedies. In *Flowers & Sons Dev. Corp. v. Municipal Court,* 86 Cal. App. 3d 818, 825, 150 Cal. Rptr. 555 (1978), the court observed that in addition to the remedies provided in the Uniform Fraudulent Conveyance Act, California courts have recognized that a personal judgment may be entered against the transferee of a fraudulent conveyance when he knowingly participates in the fraudulent conveyance with the intention of defrauding creditors, and when the property is no longer available. *See also State v. Nashville Trust Co.,* 28 Tenn. App. 388, 422, 190 S.W.2d

785 (1945) (where transferee of a fraudulent conveyance has participated in the fraud and helped to put the property beyond creditors' reach, he is personally liable for value of the property).

■ We agree with the reasoning of these courts that in certain circumstances, it is equitable to allow a creditor to recover a money judgment from the transferee of fraudulently conveyed property. We hold that a creditor may recover a money judgment from a transferee of a fraudulent conveyance who has knowingly accepted the property with an intent to assist the debtor in evading the creditor and has placed the property beyond the creditor's reach. Such a transferee is liable for the value of the property conveyed, up to the amount that the debtor owes to the creditor.[1]

Having determined that this remedy is generally available to creditors under certain conditions, we must next consider if the facts of this case satisfy the requirements for such recovery. Essentially, two elements must be addressed: whether John and Lola knowingly accepted the assets with an intent to assist Randy in evading his creditors, and whether the assets were placed beyond Deyong's reach.

First, with regard to John and Lola's state of mind in accepting the assets, the trial court found that they knew that the purpose of the conveyance of Dabob I "was to hold the property safe from Randy's creditors or until Randy got over his financial difficulties." Thus, John and Lola knowingly accepted Dabob I with an intent to assist Randy in evading his creditors.

■ The trial court made no explicit findings regarding John and Lola's state of mind with respect to the transfer of The Brute or the proceeds of its sale. Ordinarily, an

---

[1]In deciding that Deyong could not recover a money judgment from John and Lola, the trial court emphasized that John and Lola had not obtained any monetary benefit from the fraudulent conveyances. The fact that a transferee received no financial benefit from the fraudulent conveyances should not preclude the entry of a money judgment against him. As is discussed below, the critical question is not if the transferee has gained from the transaction, but if the creditor has been harmed.

appellate court cannot search the record for facts to supplement the trial court's findings. However, we will not remand for further fact finding when there is undisputed, competent evidence in the record so that a remand for formal findings would be useless. *State v. Mecca Twin Theater & Film Exch., Inc.,* 82 Wn.2d 87, 92–93, 507 P.2d 1165 (1973); *Heriot v. Smith,* 35 Wn. App. 496, 501–02, 668 P.2d 589 (1983). In this case, there is evidence in the record that John and Lola knowingly accepted The Brute and, subsequently, the $25,000 in proceeds from the sale of The Brute, with an intent to help Randy to evade his creditors. On this appeal, John and Lola have not disputed Deyong's assertions to that effect. Therefore, it is reasonable to hold that John and Lola knowingly accepted The Brute and the $25,000 with an intent to assist Randy in evading his creditors.

As for whether the assets were placed beyond the reach of Randy's creditors, Deyong challenges the trial court's conclusion that none of the fraudulent conveyances put the properties beyond Deyong's reach. Deyong contends that this determination was erroneous as a matter of law.

Regarding Dabob I, Deyong acknowledges that John and Lola returned this property to Randy, the trustee of Randy's bankruptcy estate sold the property, and its proceeds became available for Randy's creditors, including Deyong. Nevertheless, Deyong asserts that, but for the fraudulent conveyance of Dabob I, it would have obtained a judgment lien of record against Dabob I when it filed an abstract of its judgment against Randy in Jefferson County on January 30, 1980.[2] Because of the fraudulent conveyance, record title to the property was in John's name at the time Deyong filed an abstract of its judgment, and thus Deyong did not obtain a judgment lien of record. If Deyong

---

[2]Under the judgment lien statutes, when a judgment is entered in a county other than that in which the real estate of the judgment debtor is situated, the lien of judgment upon such real estate commences from the time of filing of an abstract of the judgment with the clerk of the county in which the real estate is situated. RCW 4.56.190, .200.

had had such a recognized judgment lien, it would have been entitled to all of the proceeds realized by Randy's bankruptcy estate upon the sale of Dabob I. Instead, Deyong is in the position of a general unsecured creditor of the bankruptcy estate and will only get a share of the Dabob I proceeds. Thus, Deyong asserts it has been damaged by the loss of the difference between the amount it would have received but for the fraudulent conveyance and the amount it will receive as a general unsecured creditor of the bankruptcy estate. This difference, Deyong contends, constitutes an asset which was put beyond its reach as a result of John and Lola's participation in the fraudulent conveyance of Dabob I.

In response, John and Lola argue that since they transferred Dabob I back to Randy, the proceeds from its sale are part of the bankruptcy estate and are available to Randy's creditors, including Deyong. They emphasize that no case exists where a court has found a transferee of a fraudulent conveyance personally liable when the transferee has returned the property to the original transferor before any attempt has been made to secure the property either by a general creditor under the Uniform Fraudulent Conveyance Act or a judgment creditor under execution statutes. They cite cases in which it was held that the fraudulent transferee was not personally liable when he returned to the fraudulent transferor the asset or proceeds of the asset before the creditor obtained a judgment against the fraudulent transferor. *See Northborough Nat'l Bank v. Risley,* 384 Mass. 348, 424 N.E.2d 522 (1981); *Modin v. Hanron,* 346 Mass. 629, 195 N.E.2d 61 (1964). However, those cases are distinguishable from the facts of the present case. In those cases, by returning the assets to the transferors before the creditors obtained a judgment against the transferors, the transferees essentially placed the creditors in the same position they would have been in had the fraudulent conveyances not taken place. In the present case, the reconveyance of Dabob I to Randy did not restore the status quo since the initial fraudulent conveyance

irreparably prevented Deyong from obtaining a judgment lien of record on the property.

The trial court decided that because Dabob I was returned to Randy and the proceeds of its sale were made available to Randy's creditors, they were not placed beyond Deyong's reach. We believe, however, that this reasoning emphasizes form over substance. The key to deciding if property was placed beyond the creditor's reach is whether the creditor was harmed by the fraudulent conveyance. In this case, had the fraudulent conveyance of Dabob I not occurred, Deyong would have had a superior right to the proceeds of its sale, rather than being a general unsecured creditor. Thus, Deyong was damaged by the fraudulent conveyance of Dabob I. Therefore, the trial court erred in concluding that none of the proceeds of Dabob I were placed beyond Deyong's reach.

With regard to The Brute, Deyong contends that in addition to the $25,000 in proceeds from its sale which Randy transferred to John,[3] Deyong is entitled to recover the balance of The Brute proceeds in the amount of $34,406.07. We believe, however, that when John executed the bill of sale of The Brute back to Randy on February 15, 1980, Deyong was restored to the same position it was in before Randy initially conveyed the asset to John. Deyong argues that because John reconveyed The Brute to Randy only 5 days before it was sold to a third party and 10 days before Randy filed his petition for bankruptcy, Deyong had no meaningful time in which to levy upon it. It is true that The Brute remained in Randy's possession for a short period after it was reconveyed to him. Nevertheless, the fact is that during this time, The Brute was available to be levied upon by Randy's creditors. Therefore, we conclude that The Brute was not placed beyond Deyong's reach.

However, with respect to the $25,000 in proceeds from Randy's sale of The Brute which Randy gave to John, our analysis is different. First, the testimony at trial established

---

[3]See discussion below.

that on February 20, 1980, the same day as Randy sold The Brute, he fraudulently conveyed $20,000 of the proceeds from that sale to John, who invested these funds in Dabob II. Subsequently, John and Lola quitclaimed Dabob II to Randy's wife, Katy. After Katy came into title of the property, the attorney for the trustee in bankruptcy discovered that liens had been made against the property which appeared to equal or exceed its value. He determined that no value could be realized from Dabob II due to these encumbrances, and as a result, the bankruptcy estate abandoned it.

We conclude that, under these circumstances, the $20,000 given by Randy to John that was used to purchase Dabob II was placed beyond Deyong's reach. Just as it was futile for the bankruptcy estate to attempt to realize any value from Dabob II due to the encumbrances placed upon it, so any rights which Deyong had to execute upon Dabob II were rendered valueless. Therefore, Deyong is entitled to recover $20,000 from John and Lola for this fraudulent conveyance.[4]

As to the additional $5,000 in proceeds from the sale of The Brute which Randy gave to John on February 26, 1980, this conveyance was also fraudulent. However, because this transfer occurred the day after Randy filed his petition for bankruptcy, the $5,000 was not placed beyond Deyong's reach and Deyong may not recover a money judgment for it.

In summary, we have determined that John and Lola knowingly accepted the relevant assets with the intent to assist Randy in evading his creditors. Furthermore, Dabob I and the $20,000 which Randy gave to John on February 20, 1980, were placed beyond Deyong's reach. Therefore,

---

[4]The trial court found that no evidence was offered as to the value of the interest in Dabob II at the time it was acquired by John and Lola, or when it was transferred to Katy. This finding, however, is not determinative of whether the $20,000 used to purchase Dabob II was placed beyond Deyong's reach. The critical point is that after Katy acquired title to Dabob II, the property was encumbered to the extent that no equity remained in it that could have been reached.

Deyong can recover a money judgment from John and Lola.

As for the amount of recovery, Deyong is clearly entitled to $20,000, representing the funds Randy conveyed to John on February 20, 1980. John and Lola's liability with respect to Dabob I is a more complicated matter. Deyong is entitled to recover the difference between the amount it would have received but for the fraudulent conveyance of Dabob I, and the amount it will receive from the proceeds of the sale of Dabob I as a general unsecured creditor of the bankruptcy estate. Deyong would have received $51,274, or the entire proceeds of the sale of Dabob I, had the fraudulent conveyance not occurred. As a general unsecured creditor, Deyong will receive only a portion of that sum. The exact amount which Deyong will receive, however, is not clear from the record. We believe the equitable solution with respect to Dabob I is to allow Deyong to recover $51,274, with the condition that the judgment will be reduced by the amount Deyong receives in the future as a distribution from Randy's bankruptcy estate which is attributable to the proceeds of the sale of Dabob I.

We remand this case to the trial court for proceedings consistent with this opinion.

ENNIS and HANSEN, JJ. Pro Tem., concur.