[No. 17193-3-I. Division One. November 23, 1987.]

EARL F. TILLY, ET AL, *Appellants,* v. JOHN DOE, ET AL, *Respondents.*

*Marvin L. Gray, Jr., Richard J. Schroeder,* and *Davis & Wright,* for appellants.

*Andrew Seiple, Daniel Gandara,* and *Lane, Powell, Moss & Miller,* for respondents.

REVELLE, J.*—In March 1980, appellant Earl Tilly sold

---

*This appeal was heard by a Supreme Court Justice, a Superior Court Judge, and a retired Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

the assets of his farm equipment dealership, Tilly Equipment, Inc., to Jim Scammahorn and Bob Richards. The purchasers paid $100,000 in cash and notes at the time of closing, agreed to pay the balance of $239,154 in monthly installments, and assumed approximately $129,000 in liabilities. The purchaser's obligations were to be secured by the assets of the business.

Respondent John Doe, Tilly's attorney, drew up the papers for the transaction but failed to obtain and perfect a valid security interest. The court below granted Tilly's motion for partial summary judgment against Doe on the issue of liability and the case proceeded to trial on the issue of damages.

As the trial court noted in its oral opinion, the material facts are not in much dispute. The purchasers defaulted in the fall of 1981. On November 27, 1981, respondent notified them that the obligations were being accelerated. At this time the outstanding obligations (including Tilly's debts to third parties which the purchasers had assumed) totaled $309,353.

The principal issues at trial were the valuation, as of the date of default, of the assets which should have secured Tilly's claims, and the determination of what other creditor's claims would have had priority in those assets had Tilly's claims been secured. The common starting point of the parties was exhibit 16, the purchasers' financial statements as of October 31, 1981.

The principal assets, as of the date of default, were fixed assets (furniture, fixtures, equipment, and vehicles), accounts receivable, and inventory. Appellants do not dispute here the trial court's findings that the yield would have been $100,000 for the accounts, and $22,966 for the fixed assets after costs of sale and satisfying prior encumbrances.

The inventory was carried on the books at $1,048,974. Appellant Earl Tilly testified that the fair market value of the inventory was at least equal to the book value (which was based on dealer costs), and that the inventory could

have been sold for that much plus a markup within a reasonable period of time in the ordinary course of business. The parties agreed, however, that if the inventory were liquidated by auction or other distress sale, it would net only a fraction of its book value. There was some variation in the parties' estimates of the likely realization at a distress sale, but the trial judge settled on the figures of 68 percent of book value for new and used equipment and 28½ percent for parts and accessories.

Against these assets at the date of default were $808,584 in debts arising from floor–plan financing of inventory by equipment vendors and a bank. In addition, at the time of default, the purchasers had a substantial bank overdraft. The trial court ruled that this overdraft would also have taken priority over Tilly's claims in the inventory had they been secured.

On the basis of its findings and conclusions, the trial court determined that at the time of default, Scammahorn's obligations of $309,353 would have been secured by assets worth only $122,966; the balance would therefore have been unsecured. The court concluded that Tilly would have collected the secured portion in full, and would have collected 20 percent of the unsecured portion, for a total of $162,481, on the basis of the plan of reorganization ultimately adopted in Scammahorn's bankruptcy in 1984. The bankruptcy plan predicts an eventual recovery of 20 cents on the dollar for unsecured creditors such as Tilly. On the basis of this projected recovery, the trial court deducted 20 percent of Tilly's claim in bankruptcy, or $64,108, leaving Tilly's recovery at $98,373 plus prejudgment interest. This appeal followed.

### MEASURE OF DAMAGES

Appellants first contend the trial court erred in concluding that the proper measure of damages was the amount for which the collateral at issue could be sold at auction. They argue that under *Ferrell v. Cronrath*, 67 Wn.2d 642, 409 P.2d 472 (1965), the proper measure of damages must be

the fair market or going concern value of the collateral, or the amount of the debt, whichever is less. We disagree.

■ Under Washington law, the value of a security interest lost through another's negligence is "the value *of the loss* of the security interest, not the value of the personal property." (Italics ours.) *Hecomovich v. Nielsen,* 10 Wn. App. 563, 573, 518 P.2d 1081 (1974) (citing *Ferrell v. Cronrath, supra*); *Andersen v. Northwest Bonded Escrows, Inc.,* 4 Wn. App. 754, 760, 484 P.2d 488 (1971); *Bowers v. Transamerica Title Ins. Co.,* 100 Wn.2d 581, 675 P.2d 193 (1983) (citing *Ferrell v. Cronrath, supra*). Contrary to appellants' assertions, the Washington cases do not state that the "value" of the loss of a security interest is always the fair market value of the collateral. Rather, the value of the loss will be the fair market value of the collateral only if credible evidence establishes such value,[1] *see Ferrell,* at 645, and only if this value was actually lost.

In other words, the fair market measure should not apply if the application of that measure of damages would result in a windfall to the plaintiff. *See Calumet Fed. Sav. & Loan Ass'n v. Lake Cy. Trust Co.,* 509 F.2d 913, 920–21 (7th Cir. 1975). In this regard, certain evidence of collectibility produced at trial indicated that even if appellants' security interest had been perfected, appellants would not have been able to foreclose on and sell the collateral because Scammahorn would have immediately filed for bankruptcy. Other evidence indicated that even if appellants had been able to repossess the collateral, they might have sold the collateral for its auction value. Thus, the record supports a conclusion that appellants could not have received the fair market value of the collateral, and therefore, the trial court did not err in valuing the collateral at its auction value. This result is consistent with the purpose

---

[1]In this regard, we note that the trial court was entitled to disbelieve or reject appellants' evidence as to the fair market value of the collateral, *Ivy v. Argentieri,* 2 Wn. App. 999, 471 P.2d 122 (1970), and this court must uphold an award of damages if it is within the range of relevant testimony. *Cultum v. Heritage House Realtors, Inc.,* 103 Wn.2d 623, 633, 694 P.2d 630 (1985); *Ferrell,* at 645.

of awarding damages for injury to property in tort actions; *i.e.*, to place the injured party in the condition in which he would have been had the wrong not occurred. *Wilson v. Brand S Corp.*, 27 Wn. App. 743, 621 P.2d 748 (1980). The result is also consistent with the rule that the measure of recovery in attorney malpractice actions is the amount of loss *actually sustained as a proximate result* of the conduct of the attorney. *Martin v. Northwest Wash. Legal Servs.*, 43 Wn. App. 405, 717 P.2d 779 (1986); 2 J. Dooley, *Modern Tort Law* § 33.09, at 105 (Supp. 1983).

## PROOF OF COLLECTIBILITY

Appellants next contend the trial court erred in holding that they were required to prove the collectibility of their damages. They argue that a collectibility test is inappropriate in this type of case because collectibility is already built into the measure of damages for the loss of a security interest.

On the other hand, respondents argue that a plaintiff in a legal malpractice action must prove collectibility, and therefore the trial court properly admitted evidence tending to show that Tilly would not have been able to collect all of his secured claim in the bankruptcy proceedings had the security interest been perfected.

Washington courts have not yet addressed the issue of collectibility in attorney malpractice actions. However, most jurisdictions require proof of collectibility in order to establish "'the amount of loss actually sustained as a proximate result of the conduct of the attorney.'" *Taylor Oil Co. v. Weisensee,* 334 N.W.2d 27, 29 (S.D. 1983) (quoting 7A C.J.S. *Attorney and Client* § 273a (1980), and citing cases). Thus, since collectibility is essentially an extension of proximate cause analysis, and since the plaintiff normally has the burden of proving proximate cause in a legal malpractice action, *Martin v. Northwest Wash. Legal Servs., supra,* we hold that the trial court did not err in requiring proof of collectibility, and the evidence relevant to collectibility was

properly admitted on the issue of proximate cause.[2]

## PRIORITY OF BANK OVERDRAFT

Appellants next contend the trial court erred in holding that an overdraft of $194,000 would have taken priority over appellants' claims had they been secured. They argue that since the overdraft could only have been created by checks honored by the bank and charged to Scammahorn's account, the overdraft represented a debt owed to the bank, not to the vendors paid by the bank, and therefore the overdraft is simply a junior or unsecured claim which would not be entitled to priority over appellants' security interest.

A review of the record discloses no direct evidence showing whether the checks underlying the overdraft were written to vendors, no evidence of whether the checks creating the overdraft amount were or were not honored by the bank, and no evidence of whether the bank had a legal basis for a security interest (in the inventory, etc.) in the amount of the overdraft. However, we do not see how an overdraft could occur unless the bank had in fact honored the underlying checks. Therefore, since the bank must have honored the checks, the vendors had no security interests, and the bank's payment of the overdrafts was unsecured unless the bank either (1) was subrogated to the rights of the vendor/payees, or (2) had some agreement with the account holder (Scammahorn) giving it priority for credit advanced. There is no evidence in the record showing how the bank would be entitled to a security interest in the amount of the overdraft, and therefore the trial court erred in deducting the overdraft from the total amount available to appellants in the bankruptcy proceedings.

## BANKRUPTCY DIVIDEND

Appellants next contend the trial court erred in deducting from their claim an amount equal to the dividend they

---

[2]We note, however, that some courts have held that it is the attorney, rather than the plaintiff, who bears the burden on the issue of collectibility in a legal malpractice action. *See, e.g., Hoppe v. Ranzini,* 158 N.J. Super. 158, 385 A.2d 913 (1978).

are projected to be awarded in the bankruptcy court. They argue that while the court may deduct actual dividends received, it cannot deduct dividends which have not materialized, and which may never materialize. We agree.

 Where precise measurement of damages is not possible, the trial judge must exercise sound discretion. *Huzzy v. Culbert Constr. Co.*, 5 Wn. App. 581, 489 P.2d 749 (1971). In the instant case, the precise measure of damages is not ascertainable because the bankruptcy dividend may or may not materialize. Thus, we must determine whether the trial court abused its discretion in deducting the projected amount of the dividend.

Appellants are correct in pointing out that the recovery of the projected dividend is simply too uncertain to justify a reduction of damages equal to the projected amount. Furthermore, appellants' contention that the risk of an insufficient bankruptcy dividend should fall on respondent, not appellant, is justified and equitably appropriate. Under these circumstances, subrogation of respondent to appellants' future recovery in bankruptcy is equitably required.[3] In this regard, *Coy v. Raabe,* 69 Wn.2d 346, 350–51, 418 P.2d 728 (1966) states:

> Subrogation is an equitable doctrine. This court well stated the doctrine in *Credit Bureau Corp. v. Beckstead,* 63 Wn.2d 183, 385 P.2d 864 (1963), when it said:
>> Subrogation is a purely equitable doctrine, a fiction invented for the purpose of arriving at an obviously equitable result. *Omicron Co. v. United States Fidelity & Guar. Co.,* 21 Wn. (2d) 703, 708, 152 P. (2d) 716 (1944). It is founded in the facts and circumstances of each particular case and on the principles of natural justice. In general, it will be applied wherever any person, other than a mere volunteer, will suffer damage because of the unjust enrichment of another. The doctrine, however, will not be applied if it would work injustice to the rights of those *having equal or superior equities;* nor will it be enforced against a *bona fide purchaser* for value without notice or one who, in good

---

[3]*See Deyong Mgt., Ltd. v. Previs,* 47 Wn. App. 341, 352, 735 P.2d 79 (1987).

faith, has changed his position in reliance upon the act which subsequently is claimed to have been a mistake. (Italics ours.)

Subrogation is a consequence which equity attaches to certain conditions. It is not an absolute right, but one which depends upon the equities and attending facts and circumstances of each case.

We affirm as to the measure of damages and admission of evidence relevant to collectibility but reverse as to the bank overdraft and deduction for the projected bankruptcy dividend and remand for a subrogation award consistent with this opinion.

Affirmed in part, reversed in part, and reversed and remanded in part.

ANDERSEN and HALEY, JJ. Pro Tem., concur.

Reconsideration denied January 19, 1988.

Review denied by Supreme Court May 3, 1988.