[No. 23262-6-II. Division Two. July 14, 2000.]

PAUL MATSON, ET AL., *Respondents*, v. JERRY WEIDENKOPF, ET AL., *Appellants*.

---

[127] *Nirk*, 30 Wn. App. at 221.

474

*David E. Bailey* and *Lawrence E. Nelson* (of *Law Offices of Lawrence E. Nelson, P.S.*), for appellants.

*William R. Michelman*, for respondents.

ARMSTRONG, C.J. — Paul, Rose, and Greg Matson retained attorney Jerry Weidenkopf to collect on three promissory notes executed by Vance and Julie Shafer. Weidenkopf took no action to recover on the notes, and the statute of limitations ran. The Matsons then sued Weidenkopf for legal malpractice and were awarded the full amount due on the notes, plus the interest accrued to the expiration of the statute of limitations. They were also awarded prejudgment interest.

On appeal, Weidenkopf contends that the statute of limitations did not run while he was the Matsons' attorney because Vance Shafer acknowledged the debt and started the limitations period anew. In the alternative, Weidenkopf argues that the statute of limitations ran on the legal malpractice claim because the Matsons should have known when the statute of limitations expired on the underlying action. Lastly, Weidenkopf argues that the Matsons failed to prove the underlying judgment could have been collected

from Julie Shafer and that the trial court erred in awarding prejudgment interest because the claim is unliquidated. Finding no error, we affirm.

## FACTS

In 1984, Paul and Rose Matson and their son, Greg Matson, invested money in Vance Shafer's real estate mortgage business. Paul and Rose Matson first invested $5,000 and later an additional $2,000 with Shafer. Greg Matson invested $4,000. In return for each investment, the Matsons received a promissory note secured by a deed of trust. Each note had a one-year maturity at 20 percent interest. After maturity and on upon default, the notes also paid 20 percent interest.

Vance and Julie Shafer signed each note, as co-makers. When the notes were signed, the Shafers were married. They divorced in July 1986. Neither Vance nor Julie Shafer made any payments on the promissory notes, and each note went into default on the date of maturity. The $5,000 note matured on August 14, 1985, the $4,000 note on September 13, 1985, and the $2,000 note on October 16, 1985.

After default, Vance Shafer offered Paul Matson stock in InfoCode, a new company that Shafer was starting. Paul Matson testified that the stock was in exchange for the promissory notes. Paul Matson was told that this investment would return more money than the original investment secured by the promissory notes. In reliance on Shafer's promise, he returned the $5,000 and $2,000 promissory notes to Vance Shafer. Greg Matson was not asked to exchange his note for stock, and he retained possession of his $4,000 promissory note. Paul and Rose Matson never received any shares of stock in InfoCode.

Vance Shafer wrote Paul and Rose Matson two letters about InfoCode. Written in October 1987, the first letter states, in part:

> Thank you for your confidence in InfoCode. As you have already been advised, your investment of $11,832.00 entitles you to

ownership of 1,183,200 shares of InfoCode stock. This letter will serve as a receipt for the amount of money specified above.

In the second letter, dated January 9, 1988, Shafer told Paul and Rose Matson that, "the stock of InfoCode is not trading because the financial statements are not current." He further explained that there are "two companies coming out of InfoCode . . . [which] is really a much better deal for us" and "the new stock certificates are into the Stock Transfer Company. . . . We are just waiting now for them to be sent back to us." He closed the letter with, "I apologize for any delays. I am working hard to overcome them and am working hard to clear up past problems as well. The future looks brighter, and certainly you will agree that the addition of two more companies is a nice START."

A third letter, dated March 24, 1988, to Greg Matson states:

> I am writing this letter to report to you on the progress of . . . our public offering and, thereby, on the progress of our loan repayment efforts.
>
> The Form S-1 filing for our Company has been before the SEC for in excess of two months without receiving a "comment letter," which technically means our issue is approved for trading. As a result, as soon as we are able to get approval for trading from the State Securities Division for the state of incorporation, we will be in a position to repay your loan within a period of three weeks. . . .

In June 1990, Paul Matson hired attorney Jerry Weidenkopf to collect the money due on all three notes. He gave Weidenkopf all of the documents he had, including copies of the three promissory notes and the deeds of trust. Weidenkopf agreed to handle the matter and was paid a $300 retainer. Greg Matson authorized his father to act on his behalf in the collection of his note.

After a year with no progress on the case, Paul Matson contacted Weidenkopf's office but was unable to get any information. He wrote letters and made phone calls to Weidenkopf without any response. Finally, Weidenkopf

responded on January 28, 1992, with a letter to Paul and Rose Matson. He apologized for the delay. He explained that he had a full caseload, that the Matson's claim was a low priority, and that it was in their "best interest not to act quickly in attempting to 'win' against a white collar crime person."

After this letter, Paul Matson still saw no activity on the case. He tried again to contact Weidenkopf but got not response until August 6, 1993, when Weidenkopf wrote the Matsons and told them he was dropping their case because he was too busy.

The trial court found that the statute of limitations on the three promissory notes expired on August 14, September 13, and October 16, 1991. This is based on the six-year statute of limitations for written instruments. *See* RCW 4.16.040(1). Weidenkopf's first letter was written over three months after the statute of limitations had expired on the last note. Weidenkopf never advised the Matsons that the statute of limitations had expired.

In February 1994, Paul Matson went to another attorney and learned for the first time that the statute of limitations had expired on all three notes. The Matsons' legal malpractice suit was filed in December 1994.

The trial court found that the Matsons were naive about investments and legal matters. They "could not have known" that Weidenkopf was no longer working on their claim until after his last letter dated August 6, 1993, and they "could not have known" that they had a legal malpractice claim against Weidenkopf until that date. The court applied the discovery rule to the Matsons' suit and concluded that it was filed within the three-year statute of limitations.

The court also concluded that the Matsons were entitled to simple interest on their respective notes from the date the notes were made through the date of the expiration of the statute of limitations on the notes. By the terms of the promissory notes, the interest rate is 20 percent per annum

on each note. The plaintiffs were also awarded prejudgment interest on the notes, at a rate of 12 percent per annum, from the date that the applicable statute of limitations expired until entry of the findings of fact and conclusions of law.

## ANALYSIS

### I.   Acknowledgment of the Debt

■  To establish legal malpractice, a plaintiff must show (1) the existence of an attorney-client relationship; (2) a duty on the part of the attorney; (3) the failure to perform the duty; and (4) the attorney's failure to perform the duty is a proximate cause of the client's damages. *Martin v. Northwest Wash. Legal Servs.*, 43 Wn. App. 405, 408, 717 P.2d 779 (1986).

Weidenkopf argues that his inaction was not the proximate cause of the Matsons' damages because Vance Shafer acknowledged the debt and restarted the statute of limitations. He contends that the letters from Vance Shafer acknowledge the amount of the promissory notes, promise stock in return for investment, refer to ongoing efforts to issue stock certificates, and contain a reassurance that the loan would be repaid. His argument raises two possible issues: Are the letters to the Matsons sufficient to create an acknowledgment of the debt and, if so, did Vance Shafer's acknowledgment bind his ex-wife, Julie Shafer?[1] The second issue is dispositive.

■■  Assuming that the letters are sufficient to create an acknowledgment, the question is whether Vance Shafer can acknowledge a debt on behalf of his ex-wife, Julie Shafer. A written and signed acknowledgment or promise to pay a debt restarts the statute of limitations. *See* RCW 4.16.280; *Jewell v. Long*, 74 Wn. App. 854, 856, 876 P.2d 473 (1994). When an acknowledgment is made before the run-

---

[1] The Matsons are unable to collect the debt from Vance Shafer because he cannot be located.

ning of the statute of limitations, we infer a promise to pay unless the writing expresses a contrary intention. *Cannavina v. Poston*, 13 Wn.2d 182, 195, 124 P.2d 787 (1942) (citing *Griffin v. Lear*, 123 Wash. 191, 200, 212 P. 271 (1923)). RCW 4.16.280 provides:

> No acknowledgment or promise shall be sufficient evidence of a new or continuing contract whereby to take the case out of the operation of this chapter, unless it is contained in some writing signed by the party to be charged thereby; but this section shall not alter the effect of any payment of principal or interest.

As a general rule an acknowledgment or part payment by a joint debtor does not suspend the statute of limitations as to the other debtor, unless he or she authorizes or ratifies the payment or acknowledgment. 18 SAMUEL WILLISTON & WALTER H.E. JAEGER, A TREATISE ON THE LAW OF CONTRACTS § 2079 (3d ed. 1978). Washington has not addressed the issue with respect to acknowledgments but has adopted the general rule as to part payment by a joint debtor. *See e.g.*, *Pederson v. Jordan*, 177 Wash. 379, 382, 32 P.2d 114 (1934); *Catlin v. Mills*, 140 Wash. 1, 3-4, 247 P. 1013 (1926). But when the joint debtors are husband and wife, Washington cases have been inconsistent.

In *Stubblefield v. McAuliff*, 20 Wash. 442, 443, 55 P. 637 (1898), a husband and wife executed a promissory note secured by a mortgage on the community estate. The husband made payments on the note six years after the date of maturity. Some payments were made before and some after the wife's death. There was no contention that the wife authorized any of the payments. *Stubblefield*, 20 Wash. at 443. The court said:

> It is clear that, under the section of our statute requiring a new promise to be in writing in order to revive or continue the obligation, one of two co-debtors could not make such promise for the other without express authority, whether the acknowledgment or promise was made before or after the statutory bar had attached; and it is equally apparent, upon principle, that the same rule controls in payments upon an existing obligation.

*Stubblefield*, 20 Wash. at 449.

In 1926, the Supreme Court expressly rejected this language and held that part payment by the husband will restart the statute of limitations as to the community. *Catlin*, 140 Wash. at 4-5. The rationale was based on a statute that gave management and control of the community property to the husband.[2] *See Catlin*, 140 Wash. at 4-5 (citing Rem. Comp. Stat. §§ 6892, 6893).

Eight years later, in *Pederson*, 177 Wash. at 382-83, the court made no reference to *Catlin* and held that the husband had authority to waive the statute of limitation on a note as to his wife, a joint-obligor, because he had her power of attorney.

And one year later, in *Addison v. Stafford*, 183 Wash. 313, 315, 48 P.2d 202 (1935), the court relied on *Stubblefield* and held that payments of principal and interest on a note by the former husband did not interfere with the wife's right to rely upon the statute of limitations. In the divorce decree, the husband was required to pay the note and mortgage and the wife was awarded the property subject to the lien. The husband and the wife signed the note but she made no payments. *Addison*, 183 Wash. at 314.

Finally, in *Milroy v. Movie*, 189 Wash. 17, 21, 63 P.2d 496 (1936), the Court followed *Catlin* and held that "payment made by the husband, manager of the community property, tolled the statute of limitations as to the community" and, therefore, part payment on a community obligation will start the statute of limitations against both the husband and wife. In response to the wife's argument that the husband's payment could not bind her because the mortgage was on her separate property, the court said, "[I]f the payment was made by the husband under circumstances implying the consent or authorization of the wife, she would be bound as much as if made directly by herself, since the husband would, in that case, be acting as the wife's agent." *Milroy*, 189 Wash. at 22.

The common thread in all of these cases is that the spouse

---

[2] Today, either spouse, acting alone, may manage and control the community property, subject to six statutory exceptions. RCW 26.16.030.

must have authority to acknowledge the joint debt of the other spouse. "Authority to make the new contract, or authority to extend or revive the liability, is essential to its validity." *Stubblefield*, 20 Wash. at 449. Authority has been inferred from the community relationship, *see Milroy*, 189 Wash. at 21, or established based on an express authorization, such as a power of attorney, *see Pederson*, 177 Wash. at 383.

Here, there is no evidence that Vance Shafer had authority to acknowledge the debt on behalf of Julie Shafer. The letters that Weidenkopf relies on were all written or received after 1986, the year the Shafers were divorced. In addition, only Vance Shafer signed the letters. Julie Shafer testified that she was not involved in Vance's business dealings and that he accepted full responsibility for the notes "in the divorce papers." Because Vance Shafer had no authority to acknowledge the debt on behalf of his ex-wife, the statute of limitations did not restart as to her. Therefore, Weidenkopf's failure to pursue a claim against her before the statute of limitations ran was a proximate cause of the Matsons' damages.

## II.  Is the Matsons' Legal Malpractice Action Barred by the Statute of Limitations?

Weidenkopf also argues that, even if he was negligent, the Matson's legal malpractice claim is barred by the statute of limitations. He claims that the statute of limitations on the malpractice action ran three years from the date the statute of limitations ran on the last note, October 16, 1994. The Matsons filed their suit on December 30, 1994. He contends that the trial court misconstrued the discovery rule and that the Matsons did not act with due diligence in pursuing their claim against the Shafers. We disagree.

The statute of limitations for a legal malpractice action is three years. *French v. Gabriel*, 116 Wn.2d 584, 595, 806 P.2d 1234 (1991); RCW 4.16.080(3). But, because the

discovery rule applies, the statute does not begin to run "until the client discovers, or in the exercise of reasonable diligence should have discovered the facts which give rise to his or her cause of action." *Peters v. Simmons*, 87 Wn.2d 400, 406, 552 P.2d 1053 (1976); *see French*, 116 Wn.2d at 595. The discovery rule does not require knowledge of the existence of a legal cause of action; instead, the statute of limitations begins to run when "the plaintiff knew or should have known all of the essential elements of the cause of action, *i.e.*, duty, breach, causation and damages." *Gevaart v. Metco Constr., Inc.*, 111 Wn.2d 499, 501-02, 760 P.2d 348 (1988). The application of the discovery rule generally is a question of fact. *Richardson v. Denend*, 59 Wn. App. 92, 95, 795 P.2d 1192 (1990) (citation omitted).

Weidenkopf argues that the Matsons could have discovered the length of time allowed to sue on the promissory note. He contends that their failure to do so is a lack of due diligence that should prevent the application of the discovery rule. Weidenkopf's argument is misplaced. The focus is not on whether the Matsons used due diligence in pursuing their claim against the Shafers, but whether they used due diligence in pursuing their claim against Weidenkopf once the facts of the legal malpractice action were known or should have been known. The injury to the Matsons was caused by Weidenkopf's failure to sue the Shafers before the statute of limitations ran. Therefore, the question is when did the Matsons know or should have known that they were injured by their lawyer's inaction. *Richardson*, 59 Wn. App. at 96 ("In professional malpractice cases, the pivotal factor which tolls the running of the statute of limitations is the absence of knowledge of injury."); *see Gevaart*, 111 Wn.2d at 501-02.

The trial court found that the Matsons could not have known Weidenkopf was no longer working on their claim until August 6, 1993, the date Weidenkopf wrote that he was no longer handling their case. The court also found that they could not have known they had a legal malpractice

claim against Jerry Weidenkopf until that date.[3] These findings are supported by substantial evidence. Although Paul Matson testified that he had heard about the statute of limitations generally through reading newspapers, talking to people, and in connection with other actions, he also said that he learned for the first time that the statute of limitation expired on the promissory notes when he consulted another attorney after Weidenkopf dropped his case.

Moreover, the discovery rule applies to legal malpractice actions because "ultimately the client has little choice but to rely on the skill, expertise, and diligence of counsel." *Peters*, 87 Wn.2d at 406. "The primary reason for extending and applying the [discovery] rule [in professional malpractice cases] is because the consumer of professional services frequently does not have the means or ability to discover professional malpractice." *Peters*, 87 Wn.2d at 405.

Here, the Matsons brought their case to Weidenkopf within the statute of limitations. Almost a year went by with no progress on the case. Although Paul Matson wrote letters and made phone calls to Weidenkopf, he was unable to get any information or response. When Weidenkopf finally responded on January 28, 1992, the statute of limitations on the notes had run. He advised the Matsons at that time that their case was a "low priority" and that it was in their "best interest not to act quickly in attempting to 'win' against a white collar crime person."

If Weidenkopf had advised the Matsons that the statute of limitations had run, they would have had knowledge of the facts essential to their malpractice cause of action. Instead, almost a year and a half later, Weidenkopf dropped the case without mentioning that the claim was barred. Six months later, the Matsons contacted a new attorney and learned for the first time that the statute of limitations had expired. Within the next nine months, they filed a legal

---

[3] Although this finding is technically incorrect because the Matsons did not need to know about the existence of a legal malpractice claim, finding of fact 31, when read as a whole, suggests that the trial court was referring to knowledge of injury from the attorney's actions.

malpractice action. Because Weidenkopf encouraged the Matsons not to act quickly on their claim, the trial court did not err in applying the discovery rule.

### III.  Damages

A.   Is the evidence sufficient to establish that the Matsons could have collected a judgment against Julie Schafer?

█ Weidenkopf challenges the award of damages. He first argues that the appropriate measure of damages is the amount the Matsons could have collected from the Shafers before the running of the statute of limitations. The Matsons argue that collectibility is not an issue and that the measure of damages is the full amount due on the notes plus interest until the statute of limitations expired. We agree with Weidenkopf that collectibility of the underlying judgment is a component of damages in a legal malpractice action.[4] *See Tilly v. Doe*, 49 Wn. App. 727, 732-33, 746 P.2d 323 (1987). But here, the evidence is sufficient to support a finding that the Matsons could have collected on a judgment against Julie Shafer.

The measure of damages for legal malpractice is the amount of loss actually sustained as a proximate result of the attorney's conduct. *Tilly*, 49 Wn. App. at 732; *see Martin v. Northwest Wash. Legal Servs.*, 43 Wn. App. 405, 412, 717 P.2d 779 (1986); *Schirmer v. Nethercutt*, 157 Wash. 172, 180-81, 288 P. 265 (1930). Courts consider collectibility of the underlying judgment to prevent the plaintiff from receiving a windfall: "[I]t would be inequitable for the plaintiff to be able to obtain a judgment, against the attorney, which is greater than the judgment that the plaintiff could have collected from the third party[.]" *Kituskie v. Corbman*, 452 Pa. Super. 467, 682 A.2d 378, 382 (1996), *aff'd*, 552 Pa. 275, 714 A.2d 1027 (1998).

---

[4] "[O]ther jurisdictions considering the issue of collectibility of damages have unanimously concluded that collectiblity is a part of a legal malpractice action[.]" *Kituskie v. Corbman*, 552 Pa. 275, 714 A.2d 1027, 1030-31 (1998) (collecting cases).

Here, the trial court found that "more probably than not" a judgment could have been collected from Julie Shafer. Although Weidenkopf assigns error to this finding, it is supported by substantial evidence.

Julie Shafer testified that she worked as a systems analyst for The Boeing Company continuously from 1979 to the time of trial. In 1990 and 1991, she earned approximately $35,000. Apparently, at the time of trial, she was earning between $54,000 to $55,000. In 1991, she owned a mobile home, subject to a mortgage. She received $1,300 from the sale of the mobile home in 1994. In 1990 and 1991, she had approximately $10,000 to $12,000 in savings. She also said that if she had received a demand in early 1991 for payment on the notes, she would have arranged to make payments or tried to negotiate a settlement.

Weidenkopf suggests that a judgment could not have been collected from Julie Shafer because she could not pay it in full in 1991. But a judgment may still be fully collectible even though it is paid over time. Because Julie Shafer had $10,000 to $12,000 in savings, a stable job, and testified that she would have tried to pay a legal obligation, the trial court did not err in finding that it was more probable than not that a judgment could have been collected.

B.   Did the trial court err in awarding prejudgment interest?

Weidenkopf also argues that the trial court erred in awarding prejudgment interest. We disagree.

A prejudgment interest award compensates the plaintiff for the "use value" of his damage amount from the time of loss to the date of judgment. *Hansen v. Rothaus*, 107 Wn.2d 468, 473, 730 P.2d 662 (1986). Prejudgment interest may be awarded when the claim is liquidated. *Hansen*, 107 Wn.2d at 472-73; *Flint v. Hart*, 82 Wn. App. 209, 225, 917 P.2d 590 (1996). "A claim is liquidated when the evidence furnishes data which, if believed, makes the exact computation of the amount possible without resort to opinion or

discretion." *Walla Walla County Fire Protection Dist. No. 5 v. Washington Auto Carriage, Inc.*, 50 Wn. App. 355, 358, 745 P.2d 1332 (1987). A claim is unliquidated where the measure of damages is discretionary. *Aker Verdal A/S v. Neil F. Lampson, Inc.*, 65 Wn. App. 177, 191, 828 P.2d 610 (1992).

Here, the amount of the Matson's damage claim against Weidenkopf is liquidated. The amount owing from Julie Shafer to the Matsons at any particular time was capable of exact calculation. And, although Shafer may not have paid the entire amount at one time, she would have owed interest on the unpaid amount and, as to amounts paid, the Matsons would have had the use of the money. Thus, interest on the entire amount of the debt was capable of calculation at any time. And Weidenkopf's failure to act deprived the Matsons of the use of any part of the money due. We find no error in the award of prejudgment interest.

Affirmed.

MORGAN and HOUGHTON, JJ., concur.