IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| IN THE MATTER OF THE MARRIAGE OF | ) ) ) | No. 34443-6-III |
| MARY ALICE CARLSON, | ) ) | |
| Respondent, | ) ) | UNPUBLISHED OPINION |
| and | ) ) | |
| HUGH DAVID CARLSON, | ) ) | |
| Appellant. | ) | |

FEARING, J. — Hugh David Carlson (David) and Mary Carlson, spouses of a dissolved marriage, cross-appeal numerous discretionary rulings of the dissolution court dividing property and liabilities, awarding spousal maintenance, and awarding attorney fees. Arguments from both parties that the trial court's rulings erroneously benefitted the other party suggest wise rulings by the dissolution court. Nevertheless, we independently review the record cited by the parties to determine if the dissolution court abused its

discretion. We hold the trial court did not abuse its discretion and affirm the rulings, except that we agree with David that the trial court may have performed a mathematical error, and we remand for clarification.

In a consolidated action, a limited partnership formed by David Carlson appeals the trial court's dismissal, based on the statute of limitations, of a suit to collect loans that the partnership extended to the marital couple. The partnership also appeals the trial court's dismissal, due to the statute of limitations, of a claim against Mary Carlson for alleged breach of a fiduciary duty. We affirm the dismissals.

## FACTS

David and Mary Carlson married in May 1989, when David was age 46 and Mary age 34. A perceptive dissolution court described the couple's relationship, at least in recent years, as more of a business association than a romantic bond. The couple bore no children together, but generated children during earlier marriages. The couple separated in July 2012. This appeal primarily concerns the division of property on dissolution.

During their marriage, David and Mary Carlson toiled as orchardists. The couple grew tree fruit on multiple properties in the Yakima Valley through the entities Carlson Orchards, Inc., South 80 Orchards Limited Partnership, and Carlson Agribusiness, LLC. The Carlsons also operated two other entities: HMD, LLP, formed by David and his father in 1999, and RMT Holdings, LLC, formed by Mary in 2005. The dissolution court needed to divide the entities and assets of the various entities between David and Mary.

2

David Carlson managed the orchard growing, packing, and marketing operations, and Mary oversaw the orchard finances. David also served as the salaried chair of the Washington State Apple Commission from 2003 to 2008 and, at the time of the marital dissolution, earned $6,500 per month as a consultant to Borton Fruit, a grower, packer, and shipper of fruits in the Yakima Valley.

David Carlson incorporated Carlson Orchards in 1971 or 1972 with sixty-eight orchard acres. Eventually Carlson Orchards farmed 1,900 acres of apples, cherries, apricots, peaches, and nectarines on orchards in Mattawa, Selah, Terrace Heights, Wapato, and Sunnyside. In addition to owning some of the orchard land, Carlson Orchards leased land from other entities, including the Bureau of Indian Affairs (BIA), the State Department of Natural Resources, and the Carlson owned company of South 80 Orchards. David Carlson formed South 80 Orchards between 1997 and 1999.

David Carlson and his father, Hugh Carlson, formed HMD, LLP in 1999, with the father and son as general partners and with four members of the family of Marla Contini, David's sister, as limited partners. The limited partnership engaged in acquiring, leasing, selling, and developing real estate and personal property, including farm, ranch, and commercial property. Management and control of the partnership rested exclusively with the general partners.

In 1999, Carlson Orchards' young, productive orchard in Mattawa suffered a financial loss due to a fire and spray used by government workers to douse the fire. The

spraying caused damage to fruit trees and buds. The loss limited Carlson Orchards' ability to repay loans.

After Hugh Carlson died in 2000 and after the commencement of the financial loss to Carlson Orchards, HMD amended its partnership agreement to designate three general partners: the estate of Hugh Carlson, with David as personal representative; Mary Carlson, as her separate estate; and Marla Contini. The amended agreement listed Mary's percentage of interest as a 2.5 percent general partner and a 4.0 percent limited partner. The agreement listed Hugh Carlson's estate's interest as a 2.5 percent general partner and an 80 percent limited partner. At the time of the 2015 Carlson marital dissolution trial, HMD owned assets worth $1 million.

In 2001, Carlson Orchards entered receivership due to unpaid bank loans, and David Carlson eventually liquidated the company. The lenders waived rights to the lessee's interest in BIA leases and allowed the Carlsons to use working capital needed to continue operation of the leased properties. David Carlson had personally guaranteed Carlson Orchards' bank loans. When one bank garnished his wages from the Apple Commission, David declared personal bankruptcy.

Because of the bankruptcy of Carlson Orchards, the limited partnership South 80 Orchards began its own grow operations in 2002 and eventually farmed 400 acres of orchards. David Carlson held no partnership interest in South 80 Orchards. Mary Carlson, who owned 65.4 percent of South 80 Orchards, was the general partner and

4

David's son, Nicholas, who owned a 27.5 percent interest, was one of three limited partners.

Mary Carlson suffered serious injuries in an automobile accident in 2002. At the time of the 2016 dissolution trial, Mary continued to suffer disability from the injuries, although the disability did not prevent her from work duties.

In 2005, Mary Carlson received $500,000 in life insurance proceeds from one of her son's death. Mary then formed the company, RMT Holdings, LLC to hold the insurance proceeds. RMT Holdings stands for Robert, Mary, and Tracy. Robert and Tracy are Mary's two other sons. On August 25, 2006, RMT Holdings purchased a lot on Scenic Loop in Yakima for $70,000.

Mary Carlson maintained the bookkeeping records for the limited partnership HMD and paid debts for the partnership through 2011. In 2003 and 2007, Mary wrote checks on HMD's account totaling $153,400 to South 80 Orchards to cover shortages in the latter's operating funds. South 80 Orchards signed no promissory note.

During trial, David Carlson submitted a purported July 11, 2008 addendum to the HMD limited partnership agreement that announced that Mary Carlson and Marla Contini had withdrawn as general partners, that David was now the sole general partner, and that Mary's percentage interest in the partnership was only one percent as a limited partner. At trial, a forensic document examiner declared that someone copied signatures, including Mary's signature, from earlier documents, and pasted the signatures on the

5

purported 2008 addendum.

In 2009, Mary wrote three checks totaling $165,000 on HMD's account to South 80 Orchards as working capital for the orchard.  The 2009 checks contain the abbreviation "N/P S-80," which may be shorthand for "note payable South 80."  Clerk's Papers (CP) at 292.  None of the 2003, 2007, and 2009 debts owed by South 80 Orchards to HMD had been repaid by the time of the dissolution trial.

Beginning in 2002, South 80 Orchards sold fruit to the warehouses, Borton & Sons, Inc. and Zirkle Fruit Co.  In 2009, David Carlson directed the fruit warehouses to issue payment in the name of David Carlson and Carlson Agribusiness instead of South 80 Orchards.

In 2012 and early 2013, HMD loaned a total of $400,000 to David Carlson for farming operations.  David memorialized the $400,000 loan with promissory notes that established the terms, including interest.  David repaid $221,850 of the 2012-13 debt.

On January 1, 2011, David Carlson commenced conducting orchard business under the name of Carlson Agribusiness LLC rather than South 80 Orchards.  David transferred a grower account that South 80 Orchards maintained with Tree Top Company to the name of Carlson Agribusiness.  The grower account still remains in the name of Carlson Agribusiness.  Throughout 2011, David also moved working capital funds from South 80 Orchards bank accounts to Carlson Agribusiness bank accounts.  Mary, general partner of South 80 Orchards, did not authorize the transfer of the Tree Top account to

6

Carlson Agribusiness or the transfer of funds between bank accounts. Mary claims she objected to any name change in the orchard business and contends that David, who was not a general partner in South 80 Orchards, possessed no authority to transfer a grower account from South 80 Orchards to Carlson Agribusiness. During trial, when asked if he informed Mary of the formation of the new company, Carlson Agribusiness, David responded: "I believe so, but I'm not sure." Report of Proceedings (RP) (June 17, 2015) at 587. When asked if Mary participated in the "transition from the bookkeeping at South 80 Orchards to Carlson Agribusiness," David answered: "I believe so." RP (June 17, 2015) at 588.

RMT Holdings opened two bank accounts. In January through December 2009, RMT Holdings deposited $80,225 of David Carlson's consulting fees into one of its accounts. In his appeal brief, David cites his testimony for the factual proposition that Mary placed farming income into the RMT Holdings accounts. Nevertheless, David testified that he lacked knowledge as to whether anyone deposited fruit sales income into the accounts.

Mary and David Carlson separated in July 2012, and Mary vacated the family home in September 2012. In turn, Mary filed a petition for legal separation in June 2013. During the years of the formal separation, David managed the orchard operations. Mary later converted the separation action into this marital dissolution action.

On November 19, 2013, Mary Carlson withdrew $226,485.05 from the HMD bank

7

account, and she closed the account. In February 2014, the trial court found Mary in contempt for withdrawing the funds, ordered her to place the withdrawn money into the registry of the court pending trial, and ordered her to pay David $500 to purge the contempt order. The money remained in the registry of the court at the time of trial.

Remember that, beginning in 2009, David Carlson directed Borton & Sons, Inc. and Zirkle Fruit Co. warehouses to issue fruit payments to Carlson Agribusiness rather than South 80 Orchards. In December 2013, South 80 Orchards filed suit against David Carlson and Carlson Agribusiness for conversion of income and tortious interference with business relationships. In response, David and Carlson Agribusiness filed counterclaims against South 80 Orchards for breach of contract, unjust enrichment, conversion, violation of the computer fraud and abuse act, aiding and abetting the violation of a restraining order, violation of a court-ordered confidentiality agreement, tortious interference, and breach of fiduciary duty. The counterclaims related in part to the 2003, 2007, and 2009 loans from HMD to South 80.

In the lawsuit initiated by South 80 Orchards, HMD filed an intervenor complaint in March 2014 against South 80 Orchards and Mary Carlson. HMD alleged that South 80 Orchards breached contracts by refusing to repay the 2003, 2007, and 2009 loans from HMD. HMD claimed that Mary breached the HMD partnership agreement and her fiduciary duty by withdrawing $226,485.05 from the HMD bank account in November 2013. HMD did not allege that Mary violated a fiduciary duty by distributing HMD

funds to South 80 Orchards or by asserting the statute of limitations on any debt owed by

South 80 Orchards. HMD requested a judicial order removing Mary from HMD.

The intervenor complaint read in part:

11. On or about November 19, 2013, Mary withdrew $226,485.05 from bank account 0109024540 at Yakima· Federal Savings & Loan Association (the "Withdrawn Funds.")
12. The Withdrawn Funds are the property of HMD.
13. Judge Elofson ordered Mary to pay the Withdrawn Funds into the Court's registry on January 7, 2014.
. . . .

## IV. FIRST CAUSE OF ACTION- CONVERSION AGAINST MARY

18. HMD here incorporates all prior allegations in this Complaint in Intervention.
19. Mary willfully took possession of the Withdrawn Funds.
20. The withdrawal was without lawful justification.
21. The withdrawal deprived, and continues to deprive, HMD of possession.
22. Mary's actions damaged, and continue to damage, HMD.

## V. SECOND CAUSE OF ACTION- BREACH OF PARTNERSHIP AGREEMENT AND BREACH OF FIDUCIARY DUTY AGAINST MARY

23. HMD here incorporates all prior allegations in this Complaint in Intervention.
24. By withdrawing funds in excess of her right to do so, Mary violated the HMD partnership agreements.
25. Mary has a fiduciary duty to HMD and her other partners pursuant to the HMD partnership agreements and RCW 25.05.165.
26. By acting in excess of her authority in such a way that damaged HMD, Mary breached that fiduciary duty.
27. Mary's violation of the partnership agreement and breach of fiduciary damaged, and continues to damage, HMD, for which it is entitle to recover.

CP at 1643-45 (boldface omitted).

In February 2014, the superior court entered an Order re: Interim Farming Operations. The order listed eleven properties being farmed by Carlson Agribusiness and managed by David Carlson, and the order approved a farming budget prepared by David. The order precluded David from disbursing funds from the Carlson Agribusiness bank account except for reasonable business expenses within the limitations of the budget. David could solely sign checks written on the Carlson Agribusiness account in an amount equal to or less than $2,000. Kathy Nicoloff, the Carlson Agribusiness office manager, needed to co-sign checks exceeding $2,000, and Nicoloff could sign checks only for "legitimate office expense[s]." CP at 79. The February 2014 order also directed Carlson Agribusiness to send a monthly statement of account activities to the company's accountant, who was to assess the reasonableness of business expenses. During trial, the Carlson Agribusiness accountant admitted that he never saw a co-signed check, and he never reviewed a statement of account.

David Carlson wrote a check from the Carlson Agribusiness business account for $50,000 to his attorneys. David used funds from the Carlson Agribusiness bank account to, without Mary Carlson's approval, develop a new orchard, the New Snow Valley Ranch.

The February 2014 order regarding interim farming operations recognized that

David would manage the couple's orchards during the pendency of the dissolution action.

The order also read:

> 10. For the period of the approved Budget, no salary shall be paid to Hugh David Carlson, but within the constraints of the Budget, a reasonable salary may be accrued and paid, except upon order of this court upon the court's approval of a motion duly made, noted, and heard.

CP at 79.

This appeal in part concerns the community or separate property character of subaccounts at Solarity Credit Union. In his appellant's brief, David Carlson writes that, from the time of separation in 2012, he primarily used Solarity Credit Union subaccounts for deposit of his salary, Social Security benefits, and other postseparation income. David further writes that he used funds from the Solarity accounts to pay Mary support before she filed for separation in June 2013 and thereafter to pay temporary maintenance. In support of these facts, David cites a January 8, 2016, letter from his counsel asserting such facts. He further cites to a January 31, 2015, Solarity Credit Union statement for account number 248246, a different bank account number. The credit union statement lists David Carlson as the account holder and references four subaccounts: a primary savings account with $25 therein, a checking account with $66,058.86 therein, a money market account with $3,996.17 therein, and an individual retirement account with $9,361.29 therein. The total sum is $79,441.32. The bottom of the statement lists deposits and withdrawals from dividend checking with a balance of $4,300.26 in this

subaccount. This subaccount received deposits of $2,245.00 in Social Security payments. One check for the sum of $3,000.00 is consistent with the maintenance amount paid by David to Mary, but the statement does not identify the payee of the check.

In support of his factual statement concerning the Solarity Credit Union subaccounts, David Carlson also cites a trial court exhibit that constitutes a summary of bank account activity for checking account #0000248246 at the credit union. The summary does not identify the account holder. The summary shows deposits during 2015 from an unidentified person's payments from Social Security and the State of Washington. The summary also evidences deposits into the account from payments from Borton & Sons and Carlson Agribusiness. During 2015, withdrawals from the account exceeded the deposits. The summary does not identify the purpose of the withdrawals. At the end of 2015, the account, according to the summary, held $2,741.13.

During trial, Mary Carlson testified that Solarity Credit Union subaccounts belonged to David. Nevertheless, she claimed the subaccounts were a mixture of separate property and community property. She explained:

> Q The Solarity bank account, the [2]48246.
> A Yes, that's Dave's account.
> Q All right. Do you have or did you have signature access on that account?
> A No, we have never had an account together.
> Q All right. And what's your—can you tell the Court what your position is on the character of the funds in this account whether they're community or separate?
> A It's a combination. There's also a matter of the money that he had

the checks changed to his name clear back in 2009.

. . . .

Q What deposits were made in that account, from what sources?

A His Apple Commission checks were direct deposits. His Social Security is direct deposit and retirement is direct deposit. And then there was a lot of fruit proceeds that went in there, several million.

Q All right. And where were those fruit proceeds grown?

A Pardon.

Q The fruit proceeds that went into that account, what farms were they grown on?

A They were grown on all of the farms, the 901, the 902, the 903, and 1941 were 90 percent of it. And then there's Parker Heights, West 50 and Snow Valley and the house.

RP (June 10, 2015) at 205-06.

David Carlson, in his own name or in the name of one of his entities, opened an account at Central Valley Bank, known as the 4610 account or court ordered account. In his appeal brief, David Carlson writes that "[u]nder the farming orders," he deposited all proceeds from the orchard operations into the Central Valley Bank account and paid all orchard expenses from the account. Br. of Appellant at 20 n.25. He also writes that the dissolution court directed all farm working capital to be confined to the Central Valley Bank account. David further writes that he never placed proceeds from the orchard operations into the Solarity Credit Union subaccounts. He cites RP (June 17, 2015) at 615-16 for these facts. On those pages, David Carlson testified:

Q Now that is not the Court appointed report directed to the trust account, correct?

A No.

Q That was the 610 account.

A That's correct, finally. Initially it was the one we used for the

Court.
Q Okay, and we saw from Mr. Petersen that checks were deposited into the 405 account and then immediately, same day, a check was deposited into the 610 account, that is the court directed account, correct?
A Most of the time, yes.

In June 2014, based on an agreement of the parties, the trial court consolidated all claims, counterclaims, and intervenor claims among South 80 Orchards, HMD, Carlson Agribusiness, David Carlson, and Mary Carlson with this marital dissolution action. The dissolution trial included trial on these commercial claims.

In June 2015, David Carlson purportedly sent notice of a HMD partnership special meeting to the partnership's limited and general partners. Mary Carlson, general and limited partner, never received notice of the meeting. David, his sister Marla Contini, and his sister's husband attended the partnership meeting. The attending partners removed Mary as a general partner, on the assumption that she remained a general partner. Remember a purported 2008 HMD amendment to the limited partnership agreement stated that Mary Carlson had withdrawn as a partner.

During the pendency of this dissolution proceeding and in 2014, David Carlson developed a new property, Snow Valley North Ranch. The property consisted of a lease from the Bureau of Indian Affairs commencing in 2014. David diverted assets from other community operations to fund the planting of trees and the extension of irrigation, among other development expenses. David also used community funds to pay for labor on the orchard. David did not inform Mary about the development. Mary testified that

David took $433,592.95 from Central Valley Bank account 4610 and $281,738.63 from bank account 4933 for Snow Valley North Ranch, for a total sum of $715,331.58. David testified he invested between $210,000 and $220,000 in funds into the new orchard.

By the time of the June 2015 trial, Mary Carlson had last worked in late 2014 as a bookkeeper for Topp Creek Farms. Mary earned $25 per hour. Depending on her hours of work, she garnered between $500 and $800 per month. She did not seek other employment because of the time she spent reviewing records for purposes of this dissolution proceeding. She rented a single room as her residence.

Because of injury to her back, Mary cannot sit for lengthy periods. On July 31, 2013, the Department of Labor & Industries closed Mary's worker compensation claim such that she no longer receives worker compensation benefits. She applied for Social Security disability benefits, but the government denied the application. During the pending of the dissolution, Carlson Agribusiness paid for Mary's medical insurance, but Mary feared that, at the conclusion of the proceeding, she would need to pay her own medical insurance premium at a cost of $850 per month. At trial, Mary had $21,700 in credit card debt.

The trial court ordered David Carlson to pay $3,000 in maintenance to Mary during the pending of the dissolution proceeding. As of trial, she could not pay all of her debts on that sum.

TRIAL

After filing for dissolution, Mary Carlson hired forensic accountant, Matt Peterson, to review records for the Solarity Credit Union and Central Valley Bank accounts and deposits and grower account records from Borton Fruit, Zirkle Fruit, and Treetop. The review of the bank account records would determine whether David Carlson obeyed the February 2014 order to obtain the signature of Kathy Nicoloff of all checks exceeding $2,000 and to only write checks for legitimate expenses. David failed to timely produce business records such that Peterson could not determine whether orchard expenses incurred justified the issuance of the checks from the bank accounts. Peterson's review of the records showed an unusual number of checks issued for the sum of $2,000. Writing checks for that sum would allow David to avoid the 2014 court order to obtain approval of checks exceeding $2,000. Thus, Peterson concluded David structured payments in order to avoid the court order. Peterson also found that David often overpaid accounts so that the records would appear he garnered less income. Finally, Peterson found that David failed to cash over $449,808.82 in checks from Borton Fruit in order to hide income. Peterson testified to his findings during trial.

Mary Carlson also hired James Tarver, a forensic document examiner. Mary's counsel sent Tarver numerous documents, with signatures thereon, for review. Tarver concluded that someone copied the signature of Mary Carlson from one document and posted that signature on the July 11, 2008, addendum to the partnership agreement of

HMD, which addendum removed Mary as a partner in the limited partnership.  That same person also pasted from other documents onto the addendum the signatures of Nicholas Carlson, Anthony Contini, Marla Contini, and Tanya Contini.  In other words, the signatures on the addendum were not genuine.  Tarver testified at trial by videotape deposition.

The superior court conducted a trial beginning in June 2015.  During trial testimony, David Carlson remarked about the 2003 and 2009 loans from HMD to Carlson Agribusiness:

> Q Now, we've looked at the 2003 and 4 [sic] loans or amounts paid to the—(inaudible—coughing) from—to the working capital, if you will, from HMD, correct?
> A I didn't hear the first part of the question.
> Q We've looked at the checks that we were arguing over which are now, based on your testimony, not 160,400, but 153,400, correct?
> A Correct.
> Q And then we have the 165,000 in 2009, correct?
> A Correct.
> Q And we have some 180,000, just talking principal, all of which has come out of HMD into the family working capital, correct?
> A Correct.
> Q Now as you sit here today, chief executive of Carlson Agribusiness, you acknowledge that those amounts are still owing to HMD.
> A Correct.
> Q You're acknowledging the debt right here, right now, correct?
> A Correct.

RP (June 17, 2015) at 566.

The dissolution court announced oral findings and an oral ruling in September 2015.  Custom demands that the dissolution court enter findings of fact and conclusions

17

of law on a constructed form, and the form constrains the court from entering thorough and creative findings. Thus, we rely more on the dissolution court's oral announcement of its decision rather than the written findings.

David and Mary Carlson disputed the community or separate property nature of two Carlson entities, South 80 Orchards Limited Partnership and HMD, LLP. During its September 2015 oral ruling, the dissolution court found that the Carlson marital couple operated Carlson Orchards, South 80 Orchards, and Carlson Agribusiness "very loosely," with "very little attention or respect paid to the various corporate entities." CP at 289. According to the court, outsiders viewed the corporate entities as separate, but David and Mary moved funds and debts among the entities as needed to run their orchards. The court remarked:

> I think the other reality is, is I don't know how to describe it other than that they seemed to operate South 80, Carlson Orchards, Carlson Agribusiness, all of the entities, each in the same way, each entity very loosely, very little attention or respect paid to the various corporate entities. They were really almost outward shells so that outsiders would see that these were corporate entities, but they, they moved in and out of them with kind of a personal flavor to it.

CP at 289-90.

During the oral ruling, the dissolution court noted that David Carlson disavowed any interest in South 80 Orchards when he filed bankruptcy. Nevertheless, the parties always commingled funds in South 80 Orchards with the other Carlson entities.

Therefore, against Mary's contention, the court found South 80 Orchards to be community property. The court remarked:

> [T]hey together began the migration of assets from South 80 into their various other business entities. The assets weren't dissipated. They weren't concealed. They weren't sequestered for any one individual's benefit over the other. They were moved for their mutual benefit. Consequently, I would find that South 80 has been commingled and is now community property.

CP at 290.

The dissolution court found HMD, LLP, unlike South 80 Orchards and Carlson Agribusiness, to remain the separate property of David Carlson. David and his father formed the partnership with the father owning nearly all of the entity. The court found evidence of only a single payment from community orchard operations to HMD, which the court deemed appropriate probably because of loans issued by HMD.

After the trial court characterized South 80 Orchards, Carlson Agribusiness, and HMD as either community property or separate property, the court awarded Mary Carlson fifty-five percent and David Carlson forty-five percent of the "property." CP at 296. The court qualified its ruling by commenting that the percentages might change. The court commented:

> I'm allocating the property overall 55/45, 55% in favor of Mrs. Carlson, and I will readily admit these numbers may change, but that's the overall perspective.

19

CP at 296.  The court did not expressly limit this percentage allocation to community property, although the court's other comments and the court's distribution of separate property suggests the court intended to limit the percentage split to community property.

The dissolution court valued the HMD limited partnership at $1 million.  Consistent with the court's ruling that HMD remained separate property, the court declared David's interest in HMD, which interest he primarily held as the personal representative of his father's estate, to be David's separate property.  He awarded the entire interest in HMD to David.  Nevertheless, the court found that Mary Carlson held a 6.5 percent interest in HMD.  The addendum allegedly removing Mary's interest in the limited partnership was fraudulent.  The court characterized Mary's interest as a community property interest.  The value of Mary's interest amounted to $65,000.

The court characterized the Solarity Credit Union subaccounts as community property.  The court included the amounts in the account in the percentage division of community property, but reserved until later a determination of the amounts in the account because of further business operations affecting the amount.

When allocating the orchard properties between David and Mary Carlson, the dissolution court endeavored to divide the orchards fifty-five percent to forty-five percent in line with its previous comments and to allow both parties to continue farming.  The court awarded the 901 Ranch lease to David Carlson, even though South 80 Orchards was the lessee of the United States Department of Interior.  The dissolution court also

20

awarded Homeplace Orchard and Snow Valley Orchards to David. A house and shop needed for farming lies on Homeplace Orchard. Snow Valley Orchards has a two-bedroom residence. The court also allocated to David the West 50 orchard property. In turn, the dissolution court awarded Mary the Davenport lot and three leased farming properties, referred to as the 902, 903, and 1941 orchards. None of the leased properties awarded Mary included a residence or a shop building for storing and maintaining farm equipment.

The dissolution court characterized the Scenic Loop lot to be the separate property of Mary Carlson, and the court awarded her the lot.

During the September 2015 oral ruling, the dissolution court performed a tentative calculation of the respective allocations of assets. When doing so, the court awarded David Carlson some $25,000 for three years for managing Mary's share of the community property during the pendency of the dissolution proceeding. The court, after performing the calculation, ordered a transfer payment to Mary of $180,740.

> The leases, I've described how those would be allocated and, again, that's 902, 903 and 1941 to Mrs. Carlson, and that generated roughly 225 acres to her, the home place, New Snow Valley, Snow Valley, West 50, 901 to Mr. Carlson for 210 acres.
> The value of the trees is, I don't have a value of that, but I do have wind machines that have been valued and allocated per property, and looking at the figures that were given to me—902, 903, and 1941 all going to Mrs. Carlson, came to $259,500.00. 902 was $91,000.00. 903— $89,000.00. 1941—$79,500.00.
> The properties allocated to Mr. Carlson and the value of the wind machine is 901 as $71,000.00, the home property ten, west 50—

$52,000.00, and the New Snow Valley wind machines are encompassed in the value awarded to Mr. Carlson when I gave him the $300,000.00 asset, so that would total for him $133,000.00 and, again, the HMD, I said that in the beginning, the six and a half interest, percent interest goes to Mrs. Carlson, $65,000.00.

My calculations show, and again, I haven't counted the bank accounts or the fruit proceeds, but come to $947,137.00 to Mr. Carlson, $399,500.00 to Mrs. Carlson and, again, what I allocated to Mr. Carlson was the home property, the New Snow Valley, the Bayliner, the life insurance, wind machines, came to $947,137.00.

I've allocated to Mrs. Carlson, her total is $399,500.00, made up of the Davenport lot, the HMD money of $65,000.00, and the wind machines of $259,500.00. Total—$399,500.00.

I've also subtracted the debt owing to HMD. I found that to be a valid debt, and that is $216,654.00, that's assigned to Mr. Carlson, and that left, and also subtracting—Mr. Carlson had asked for a wage in the sum of, I believe, $80,000.00 or $85,000.00, rather, for the last three years, and it's been almost exactly three years. I looked at that. Part of what he's, what he's really done is he's managed his own property, for which he should not receive a salary, but he's also managed Mrs. Carlson's property, and what I've done is given it an allocation of $25,000.00 a year, for a total of $75,000.00, so the net, after the—the assets were $947,147.00. I subtracted the debt of $216,654.00, and I subtract $75,000.00, representing his wage. That yielded a total of $655,483.00 to Mr. Carlson, and $399,500.00 to Mrs. Carlson. With a 55/45 transfer, that would generate a $180,740.00 transfer to equalize that division equitably.

CP at 300-03.

The dissolution court found that David Carlson signed notes evidencing the remaining loans from HMD in 2012-2013 and that the parties intended the loans to benefit the marital community's business interests. Accordingly, the trial court characterized the remaining $216,654 balance on the 2012-2013 debt as community debt, and the court assigned liability for the debt solely to David.

22

The court found that Mary Carlson withdrew funds from HMD's account in November 2013 in order to protect herself and not due to malice. Therefore, the trial court dismissed David's and Carlson Agribusiness' claims against Mary related to the withdrawal of funds. The superior court ordered Mary to pay interest for the period of time between withdrawal of the funds from the HMD account on November 19, 2013, and the deposit of the funds into the court registry on January 7, 2014. The amount of interest accrued was $3,648.56. The court found that after January 7, the funds were unavailable to either party due to court-ordered sequestration to protect the status quo, and thus the court did not compel Mary to pay interest after January 7, 2014.

Remember that the court ruled that Mary Carlson held a 6.5 percent interest in HMD. Mary's interest was valued at $65,000 since the value of HMD was $1 million. To facilitate the payment of the interest owed on the HMD withdrawn funds, to facilitate the termination of Mary's interest in HMD, to facilitate the payment to Mary of her retired interest in HMD, and to facilitate the withdrawal of the HMD funds on deposit with the court, the dissolution court held that the $3,648.56 in accrued interest be deducted from $65,000. In turn, the dissolution court directed that the clerk release $61,351.88 of the funds to Mary and the remaining funds to HMD.

During the September 2015 oral ruling, the dissolution court ordered David Carlson to pay Mary $3,000 per month spousal maintenance for three years in part because of her limited disability and to give her a chance to develop her orchard

23

operation and to become self-sufficient.  The court directed Mary to pay $1,000 of that

amount as the monthly premium on David's life insurance, with Mary as beneficiary.

The court ordered David to maintain the policies.  The court commented:

> Spousal maintenance—Mr. Carlson is 72, Mrs. Carlson is 60.  The, each has described their health histories as being somewhat tenuous.  Mr. Carlson frankly portrays as a very vibrant 72-year-old who, I don't think he knows the meaning of not working, and, certainly, you've gotta, whether you like my decision or not, that's a compliment, but the length of the marriage has some factor here, but I think Mrs. Carlson has demonstrated that she has a need, but what's interesting, as I said earlier, I thought this was going to be more of a spousal maintenance case than it was.  She has represented herself to be competent and capable.  She can make it on her own, and on the flip side she's described these serious health issues that she's dealt with over the last number of years.  There are certain emotional issues that were, became rather apparent and that simply just affect how you get through life.  The loss of a child.  So I was somewhat surprised, but I have to respect that.

CP at 304-05.

The trial court dismissed South 80 Orchards' claims for conversion and tortious

interference against Carlson Agribusiness and David Carlson as unsupported by the

evidence.  The court dismissed HMD's claims for repayment of the loans made to South

80 Orchards in 2003, 2007, and 2009 as untimely under the three-year statute of

limitations.  During the September 15 oral ruling, the trial court commented about the

loans:

> Next, there are loans from HMD to Dave Carlson and Carlson Orchards, and it's, they are broken into two categories.  One is, the first category is June of 2003 to March of 2007.  The transfers were approximately $153,400.00.  They had been originally asserted at

> $160,400.00, but Mr. Johnston indicated there'd been a $7,000.00 check located. These are transfers of money. There are no promises to pay, no terms indicated in any of the documents, other than some comments by Mr. Carlson offered well after the events. No interest is described. I find that the statute of limitation is three years. The three years has expired. The obligation is extinguished to that extent.
>
> There are another series of loans. July of 2009 to September of 2009. There are three transfers totaling $165,000.00. The only notations that were provided were N/P S-80. I presumed that that meant, and I believe the testimony would confirm, note payable South 80. There are no other entries, no other terms described, no promises to pay. I find that the three-year statute of limitations applies.

CP at 292. The trial court noted that both Mary and David made withdrawals from HMD for their corporate and mutual interests.

When recognizing that HMD argued that Mary was acting as a fiduciary of HMD when she issued the checks to South 80 Orchards, the court found that David was fully aware of the transfer of HMD's money to the family business and was mutually responsible. The trial court also found that David presented no credible evidence that HMD's loans to South 80 Orchards in 2003, 2007, and 2009 were made without the knowledge of the other partners, his sister, and the sister's family.

When dismissing the claim of HMD against South 80 Orchards and Mary Carlson, the dissolution court also commented:

> So, again, on the HMD checks, I just make it clear, I guess, if, it's either bound by the statute of limitations or I would treat it as a, I can go either way, treat it as a fiduciary obligation and the community is obligated, but I would assign, because of the unique nature of Mr. Carlson's relationship with HMD, the, those debts and I would not count that in the calculation.

25

CP at 310.

Mary Carlson requested attorney and expert fees due to David's intransigence. The trial court found that David, through forged documents, fraudulently removed Mary as a partner in HMD and that Mary needed to hire and pay an expert to expose the fraud. The court also found that $400,000 in fruit proceeds from the Borton warehouse mysteriously disappeared during David's orchard management. The court found that David arranged for Borton & Sons to hold $400,000 and pay the money to David after the completion of the dissolution. The trial court also found that David uncharacteristically "pre-paid" Zirkle Fruit warehouse's packing charge in order to reduce his assets for purposes of the dissolution proceeding. Mary needed the services of an accountant to expose the hiding of income and reduction of income by prepaid expenses. The court found David to be intransigent.

David Carlson argued that Mary's forensic accountant and attorneys performed deficiently when investigating the missing funds such that he should not need to pay the expert fees. The dissolution court disagreed with David's "interesting" argument of deflecting blame on others.

Mary Carlson requested $186,363.47, including $28,151.90 for the expert services of accountant Matt Peterson and document examiner James Tarver. On the basis of the finding of intransigence and also based on Mary's need for payment and David's ability

26

to pay, the dissolution court ordered David to pay Mary $50,000 in attorney fees.  The

court commented during the September 2015 ruling:

> Attorney's fees.  Mr. Carlson has suggested that each bear their own fees.  Mary Carlson has asked for an award.  The elimination of Mary Carlson from HMD by, I guess, the forged documents and the investigation that went with it.  This was a case that was kind of smothered in what I call high-octane gasoline or high octane emotion, and something happened.  The suggestion was that maybe it was Mary Carlson or someone else.  I don't find that.  I think the only person that had any interest in this and was clearly at odds with Mary was Mr. Carlson.  The fact that it was such a highly emotional issue, the fact that he was in control of the various assets, the operations, the money, and when you're, I think it's fair to say 'cause I'm in that age group, that as you get older you become more vulnerable and alert to your resources and their, their potential elimination.  It, it put Mrs. Carlson in an extremely emotion—or vulnerable position, and it was already an emotional and combative case.  I think that is a factor that I think was unnecessary, and I think Mr. Carlson was clearly the force behind it.
>
> The missing fruit proceeds at Borton was an interesting issue.  Again, that was an evolving issue throughout this case.  Mr. Carlson's deposition was taken.  Mr. Peterson was retained.  The amount that was taken was just shy of $400,000.00.  There was some criticism offered of Mr. Carlson, or of Mr. Peterson and of Mrs. Carlson's attorneys for not doing a better job in investigating the records and the missing money.  They didn't make the records incomplete, they didn't make the money go missing, and it's hard to track down what someone else has done.  I thought that interestingly the records were all maintained by, created, rather, and maintained by either Mr., created by Mr. Carlson and either maintained by him or third parties.  They were always going to be incomplete records because they weren't created by Mrs. Carlson.  These are his records, and they are only as available as he had made them.
>
> It was interesting, Mr. Peterson's, the criticism of his work, I don't think, was accurate.  It was Mr. Peterson who brought to light the issue.  Had he not brought to light this issue, $400,000.00 would have remained missing, and it would have been simply a question.  The fact that through efforts that counsel was able to discover the missing money doesn't change the fact that it was missing.
>
> . . . .

He [David Carlson] describes himself as a very highly-qualified farmer and orchardist.

CP at 305-08.

David Carlson claimed that Mary Carlson was intransigent and sought an award of attorney fees against her or at least sought to use her intransigence to preclude an award against him for his behavior. The court found Mary not to be intransigent.

After the September 2015 oral ruling, Mary Carlson submitted a five-page summary of activity in the Solarity Credit Union subaccounts during 2015. The summaries showed the total funds in the subaccounts, presumably at the end of 2015, as $16,680.39. Nevertheless, at the time of the March 2016 written decree of dissolution and final division of property, the six Solarity subaccounts included the following sums:

   i.  8426-00     $     25.00
   ii.  8426-09    $  5,923.79
   iii.  8426-10   $ 89,458.37
   iv.  8426-17    $  3,995.83
   v, vi.  8426-71, 72  $  9,359.83

CP at 1313. The accounts then totaled $108,762.82.

The dissolution court entered a written order in March 2016 that dissolved David and Mary Carlson's marriage, determined the legal and property rights of the parties, and distributed the property. Findings of fact and conclusions of law accompanied the March 2016 order.

28

LAW AND ANALYSIS

David Carlson, Mary Carlson, and HMD appeal or cross-appeal rulings of the superior court. We organize the assignments of error presented by the parties based on the party asserting the error, beginning with David's assignments.

We politely scold David Carlson for the content and nature of his appeal brief. RAP 10.3(a) addresses the content of the appellant's opening brief. Subsection 5 of the rule directs the writing of a statement of the case and the subsection declares:

> *Statement of the Case*. A fair statement of the facts and procedure relevant to the issues presented for review, without argument. Reference to the record must be included for each factual statement.

Instead of following the rule, David, with few citations to the record, presents argument in his statement of the case as to why the trial court inequitably divided the property. He contends that the trial court cast a concrete division of the property into a fifty-five percent to forty-five percent split, when the court stated the numbers may change. David then presents numerous hypothetical calculations in an attempt to show the trial court committed arithmetical error.

Compliance with RAP 10.3(a)(5) permits this reviewing court to readily discern the important facts and confirm those facts from the record. In turn, the rule facilitates an orderly and learned decision from this court. David Carlson's statement of the case impedes rather than assists this court in reviewing the trial court's rulings.

David Carlson Appeal

*Issue 1: Whether the dissolution court mischaracterized the Solarity Credit Union account as community property rather than David Carlson's separate property?*

*Answer 1: No. At least, we cannot determine by the facts forwarded by David Carlson that the trial court committed error.*

David Carlson challenges the dissolution court's division of the marital couple's property. We first address David's assignments of error as to discrete factors influencing the property division. We later address the overall question of whether the trial court equitably divided the property and liabilities.

David Carlson assigns error to two of the dissolution court's characterizations of assets. He contends the court mischaracterized the Solarity Credit Union bank subaccounts as community property and the Scenic Loop lot as the separate property of Mary. As to the bank subaccounts, according to David and with the dissolution court awarding Mary fifty-five percent of the community property, he lost fifty-five percent of the savings he accumulated in his separate property subaccounts during the marital separation because of the classification of the Solarity funds as community property.

RCW 26.09.080 controls a dissolution court's division of the marital couple's assets and liabilities. The statute directs the court to reach a just and equitable division of all of the couple's property and liabilities, whether community or separate, after considering all relevant factors. These factors include, but are not limited to:

30

> (1) The nature and extent of the community property;
> (2) The nature and extent of the separate property;
> (3) The duration of the marriage or domestic partnership; and
> (4) The economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

RCW 26.09.080.

To make a fair and equitable division of the property and liabilities in a marriage dissolution, the court must first characterize each asset owned by one or both parties as either community or separate. *In re Marriage of Kile*, 186 Wn. App. 864, 875, 347 P.3d 894 (2015). Regardless of the characterization, all property, whether community or separate, is before the court for distribution. *In re Marriage of Neumiller*, 183 Wn. App. 914, 920, 335 P.3d 1019 (2014).

Community property generally consists of property acquired during a marriage by either spouse or both spouses. RCW 26.16.030. Separate property is property owned by a spouse before marriage, or acquired by him or her during marriage by gift, bequest, devise, descent, or inheritance. RCW 26.16.010.

In Washington, the law determines each item of property's character as either separate or community property at the date of its acquisition. *In re Estate of Borghi*, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). The separate property character of fungible assets, such as money or stocks, may be destroyed through comingling. *In re Marriage*

*of Schwarz*, 192 Wn. App. 180, 190, 368 P.3d 173 (2016).

To aide in determining an asset's character, Washington courts deploy several presumptions. 19 SCOTT J. HORENSTEIN, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW § 10.1, at 189. (2d ed. 2015). The strongest presumption is that the marital community owns property acquired during a marriage. *In re Marriage of Skarbeck*, 100 Wn. App. 444, 449, 997 P.2d 447 (2000); HORENSTEIN § 10.2, at 190. The party claiming an asset acquired during the marriage as separate property bears the burden of proof. *In re Marriage of Skarbeck*, 100 Wn. App. at 449. The claimant overcomes the marital property presumption when offering clear and convincing evidence that the property was acquired with separate funds. *In re Marriage of Schwarz*, 192 Wn. App. at 189.

In his appeal brief, David Carlson alleges various facts and impliedly contends that, based on those facts, the undisputed evidence established that neither party deposited community funds into the Solarity Credit Union subaccounts. David writes that the trial court ordered all community farming income to be deposited into an account other than the Solarity Credit Union accounts and that he obeyed the order. He writes that Mary agreed that the Solarity subaccounts constituted his sole property and that Mary submitted no evidence to the contrary. David also pens that Mary's forensic accountant testified that David deposited his Social Security and pension payments into the Solarity Credit Union subaccounts.

David Carlson does not bespeak the entire truth. Mary also testified that David deposited farm income or fruit proceeds and his wages from the Apple Commission into the Solarity Credit Union subaccounts. In support of his factual allegation regarding Mary's accountant's testimony, David cites CP at 251, which constitutes a summary of deposits and withdrawals in 2015 from a subaccount at Solarity Credit Union. The summary lists deposits from the Washington State Treasurer and from Social Security. But the summary also documents deposits from Borton and from or to Carlson Agribusiness, which would involve orchard operations. These deposits could confirm Mary's testimony of the deposition of farming income into the Solarity Credit Union accounts.

This reviewing court will not disturb decisions or findings made by the trial court when they fall within the scope of the evidence presented. *In re Marriage of Mathews*, 70 Wn. App. 116, 122, 853 P.2d 462 (1993). The dissolution court solely determines the weight that evidence receives. *In re Marriage of Clark*, 13 Wn. App. 805, 810, 538 P.2d 145 (1975). This court defers to the trial court on issues of credibility. *In re Marriage of Rideout*, 150 Wn.2d 337, 350-52, 77 P.3d 1174 (2003). Substantial evidence supported the trial court's conclusion that the Solarity Credit Union accounts constituted community property.

David also maintains that, because of deposits of his Social Security payments into a Solarity Credit Union subaccount, the dissolution court effectively treated his Social

Security deposits as community property, in violation of 42 U.S.C. § 407(a) of the Social

Security Act. This section forbids transfer or reassignment of "'[t]he right of any person

to any future payment under this subchapter.'" 42 U.S.C. § 407(a); *In re Marriage of*

*Zahm*, 138 Wn.2d 213, 219, 978 P.2d 498 (1999).

In *Marriage of Zahm*, the trial court characterized one party's monthly Social

Security payment as community property, but never assigned nor calculated a future

value of this payment as part of the distribution of property. The Washington Supreme

Court held that, although the trial court mischaracterized the Social Security payment as

community property, the error was harmless because the trial court did not award a party

an offset based on future benefits. *Zahm* adopted the analysis of the Court of Appeals,

which approved consideration of Social Security benefits in determining the parties'

relative economic circumstances at dissolution: "'A trial court could not properly

evaluate the economic circumstances of the spouses unless it could also consider the

amount of Social Security benefits currently received.'" *In re Marriage of Zahm* 138

Wn.2d at 223 (quoting *In re Marriage of Zahm*, 91 Wn. App. 78, 85, 955 P.2d 412

(1998)).

*Marriage of Zahm* is both distinguishable and instructive. The Carlsons'

dissolution court did not characterize David's monthly Social Security payments as

community property and did not assign any future benefits to Mary. Although evidence

showed that David deposited the Social Security payments in a Solarity Credit Union

34

subaccount, David presented no evidence that any certain sum of those benefits existed in the account at the time of distribution.

David Carlson's insistence that the Solarity Credit Union accounts be categorized as his separate property assumes that he would necessarily be awarded the entire amount in the accounts without any offset in assets to Mary. Since the trial court may award one spouse the separate property of the other spouse and since the trial court should equitably distribute all assets, with the separate or community nature of each asset being only one consideration, we reject this assumption. Nevertheless, since the trial court did not abuse its discretion in classifying the accounts as community property, we need not discuss David's presumption.

In the body of his brief, David Carlson challenges the value assigned by the dissolution court to one of the five Solarity Credit Union subaccounts. Nevertheless, David never assigned error to the valuation of any of the subaccounts. This court will not review a claimed error unless the appellant assigns error to the ruling. *BC Tire Corp. v. GTE Directories Corp.*, 46 Wn. App. 351, 355, 730 P.2d 726 (1986); RAP 10.3(a)(5), 10.3(g).

*Issue 2: Whether the dissolution court mischaracterized the Scenic Loop lot as Mary Carlson's separate property rather than community property?*

*Answer 2: No.*

David Carlson next argues that the court should have characterized the Scenic

Loop lot as community property. David asserts that the lot presumptively constituted community property, although he does not explain why. He writes that accounts, in which the parties commingled community funds, paid for some of the expenses of the lot, presumably after its initial purchase. David probably contends that payment of the expenses by community funds necessarily transformed the lot into community property. But he cites no case law or statute in support of his contention. The law disagrees. Therefore, we affirm the dissolution court's characterization of the lot as Mary's separate property.

In Washington, the law determines each item of property's character as either separate or community property at the date of its acquisition. *In re Estate of Borghi*, 167 Wn.2d at 484 (2009). Once the separate character of property is established, a presumption arises that the asset remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate to community property. *In re Estate of Borghi*, 167 Wn.2d at 484. Significantly, the evidence must show the intent of the spouse owning the separate property to change its character from separate to community property. *In re Estate of Borghi*, 167 Wn.2d at 484-85. The law generally demands an acknowledged writing when changing the nature of real property. *In re Estate of Borghi*, 167 Wn.2d at 485. Assuming the community pays for expenses on one spouse's separate property, the property does not metamorphose to community property, but the community may obtain reimbursement for the contributions. *In re*

*Hickman's Estate*, 41 Wn.2d 519, 526, 250 P.2d 524 (1952).

Evidence shows that Mary Carlson, in 2006, purchased the Scenic Loop lot from proceeds from insurance benefits on her son's life, which benefits she deposited into an RMT Holdings bank account. David adduced evidence that Mary deposited community funds in the bank account, but only after 2006. David presents no law that imposes community property status on an asset purchased from death benefits resulting from only one spouse's child. Therefore, we assume the lot gained separate property status when purchased.

David presents no evidence of Mary deeding the Scenic Loop lot to the marital community, let alone any intent to donate the asset to the community. Therefore, the Scenic Loop lot always retained its separate property status. The community may be entitled to reimbursement for expenses paid, but David never sought reimbursement for the community.

*Issue 3: Whether the dissolution court failed to consider a required factor when dividing the couples' property?*

*Answer 3: No.*

David Carlson contends the trial court failed to consider all factors in RCW 26.09.080, including the parties' resulting economic circumstances, when it distributed the parties' assets. David emphasizes that the trial court gave Mary more property. He received only forty-five percent of the community assets and alleges he received less than

37

forty-five percent of the community's net working capital. He characterizes the award as dooming him to bankruptcy, particularly because he must also pay Mary spousal maintenance and some attorney fees. David emphasizes that he is of advanced age. He criticizes the award as inequitable particularly when he managed the community's assets during the pending of the dissolution at compensation below the minimum wage.

We review the dissolution court's distribution of property and debts for abuse of discretion. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005); *In re Marriage of Neumiller*, 183 Wn. App. at 920 (2014). Discretion is abused if exercised for untenable reasons or if the court uses an incorrect legal standard. *In re Marriage of Neumiller*, 183 Wn. App. at 920. We hold that the dissolution court did not abuse its discretion when allocating the parties' property.

As already noted, when dividing marital property, RCW 26.09.080 directs the trial court to reach a just and equitable division of the couple's property and liabilities, whether community or separate, after considering all relevant factors. These factors include, but are not limited to:

> (1)  The nature and extent of the community property;
> (2)  The nature and extent of the separate property;
> (3)  The duration of the marriage or domestic partnership; and
> (4)  The economic circumstances of each spouse or domestic partner
> at the time the division of property is to become effective, including the
> desirability of awarding the family home or the right to live therein for
> reasonable periods to a spouse or domestic partner with whom the children
> reside the majority of the time.

No single factor holds greater weight than another, but the economic circumstances of each spouse on dissolution loom paramount. *In re Marriage of Olivares*, 69 Wn. App. 324, 330, 848 P.2d 1281 (1993). The property division need not be equal or mathematically precise, but must be fair. *In re Marriage of Doneen*, 197 Wn. App. 941, 949, 391 P.3d 594, *review denied*, 188 Wn.2d 1018, 396 P.3d 337 (2017). To reach that goal, the court must consider all the circumstances of the marriage and exercise its discretion rather than apply inflexible rules.

In a long-term marriage, the trial court generally tries to place the parties in roughly equal financial positions for the rest of their lives. *In re Marriage of Rockwell*, 141 Wn. App. 235, 243, 170 P.3d 572 (2007). Still and perhaps contrary to the previous sentence, the longer the marriage, the more likely a court will make a disproportionate distribution of the community property. *In re Marriage of Rockwell*, 141 Wn. App. at 243. When one spouse is older, semiretired, and dealing with ill health, and the other spouse is employable, the court does not abuse its discretion in ordering an unequal division of community property. *In re Marriage of Schweitzer*, 81 Wn. App. 589, 596, 915 P.2d 575 (1996), *remanded on other grounds by* 132 Wn.2d 318, 937 P.2d 1062 (1997). Nevertheless, an obvious disparity in the economic condition of the parties after the award may show an abuse of the court's discretion. *In re Marriage of Kim*, 179 Wn. App. 232, 253, 317 P.3d 555 (2014).

David Carlson proclaims that the property award relegates him to bankruptcy,

particularly because he must also pay Mary spousal maintenance and some attorney fees. Nevertheless, he provided the dissolution court no analysis to verify a forty-five percent to fifty-five percent split doomsday result. On appeal, David does not identify what split he would consider equitable, but presumably he seeks an equal split. David fails to answer how a forty-five percent share of the community assets consigns him to business failure, but a fifty percent share of assets would guarantee success.

David Carlson criticizes the dissolution court for failure to consider his advanced age. RCW 26.09.080 does not expressly direct the trial court to contemplate the spouse's respective ages. Nevertheless, we recognize that the court should evaluate how the age may impact the parties' long-term financial conditions.

During the September 2015 oral ruling, the dissolution court specifically mentioned David Carlson's age as seventy-two and Mary Carlson's age as sixty when awarding spousal maintenance. We reasonably conclude that the trial court also had those ages in mind when allocating the community property owned by the couple. The dissolution court also considered David Carlson's strong work ethic as a factor in the court's expectation that David will continue to operate orchards in the future despite his age.

David admits that this court may rely on the trial court's oral ruling when assessing whether the dissolution court considered all factors. *In re Marriage of Steadman*, 63 Wn. App. 523, 526, 821 P.2d 59 (1991). The dissolution court need not

enter formal findings of fact on each factor. *In re Marriage of Steadman*, 63 Wn. App. at 526.

David Carlson fails to recognize numerous factors that render equitable the dissolution court's forty-five percent to fifty-five percent division of community property. Mary Carlson has a limited disability. The trial court awarded David all interest in HMD, valued at $1 million, minus a payment of $65,000 to Mary for her terminated interest and the repayment of a debt. The court awarded David orchard property that already had homes and sheds. The court also awarded David other separate property. Unlike Mary, David garnered, in 2015, a separate wage of $6,500 per month as an orchard consultant.

The dissolution court likely would not have abused its discretion if it awarded Mary Carlson a higher percentage of the couple's community property. In *In re Marriage of Kim*, 179 Wn. App. at 253-54 (2014), this court affirmed an award to the wife of sixty percent of community property. In *In re Marriage of Rockwell*, 141 Wn. App. at 243 (2007), this court affirmed a similar split of property.

*Issue 4: Whether the dissolution court erred in its award to David of a salary for farm management?*

*Answer 4: We do not know and remand for clarification by the dissolution court.*

David Carlson also assigns error to the trial court's award to him of only $13,750 per year for managing the couple's orchard property during the pending dissolution

41

action. We find no abuse of discretion in the dissolution court's determination of a reasonable salary, but we note a probable arithmetic error of $33,750 that likely resulted in David receiving less salary than the court intended. We remand so the trial court can determine whether it wishes to amend the judgment.

To repeat, the February 2014 order regarding interim farming operations read:

> 10. For the period of the approved Budget, no salary shall be paid to Hugh David Carlson, but within the constraints of the Budget, a reasonable salary may be accrued and paid, except upon order of this court upon the court's approval of a motion duly made, noted, and heard.

CP at 79. The dissolution court did not approve a salary amount for David until the conclusion of trial, when it calculated an equalizing payment that David would pay to Mary.

David testified during the trial that a reasonable annual salary for his services would be $140,000, "but in the interest of getting things resolved, I'm willing to take 85,000." RP (June 19, 2015) at 653. In announcing its oral decision, the court provided the following explanation of the salary it intended to award:

> [David] had asked for a wage in the sum of, I believe, $80,000.00 or $85,000.00, rather, for the last three years, and it's been almost exactly three years. I looked at that. Part of what he's, what he's really done is he's managed his own property, for which he should not receive a salary, but he's also managed Mrs. Carlson's property, and what I've done is given it an allocation of $25,000.00 a year, for a total of $75,000.00.

CP at 302. David concedes on appeal that the trial court's comments reflect a finding that a reasonable salary for managing the community farming business "was in the

42

neighborhood of $50,000 [annually], allocat[ing] approximately one half, or $25,000, of that to [David] for managing his share of the farms and conclud[ing] that $25,000 would be the fair salary for managing [Mary's] share." Br. of Appellant at 12. We agree.

David contends on appeal that "[t]here is no evidence in the record to support a reduction of the fair salary of $140,000 per year . . . down to $50,000 per year." *Id.* Nevertheless, in addition to David's agreement that he would accept $85,000 a year, evidence emphasized by Mary showed that David lived in the family home and used the farming account to pay many personal living expenses and some business expenses incurred in connection with his separate property. The salary amount ordered by the dissolution court fell within the range of the evidence presented.

David also contends that the trial court's method for effectuating Mary's payment of a share of his salary contained an arithmetical flaw. We agree and attribute the error to the trial court first giving David the benefit of entitlement to only one-half of the fair salary but then *inconsistently* treating that amount as if it must be shared with Mary.

In dividing the couple's assets and liabilities, the dissolution court allocated some, mostly nonliquid assets, one hundred percent to one spouse or the other. Because the court allocated David a net value of $730,483 of those assets and liabilities and Mary received only $399,500 in value, the court entered a judgment in favor of Mary so that she would receive 55 percent in value of the total assets and David would receive 45

43

percent in value. The court referred to the award to Mary as an "equalizing" payment even though the court arrived at something other than a 50/50 allocation.

Before calculating the equalizing payment, the court reduced the value of the assets David received by the "$75,000.00 representing his wage." RP (June 10, 2015) at 302. This likely constituted error. It was a legitimate way to account for the wage in the sense that David would *actually* receive $730,483.00 in value of the assets, but would be treated, in calculating the equalizing payment, as if he received only $655,483.00. Yet, by subtracting only half of David's wage before calculating the equalizing payment, the court likely required him to share a wage already reduced to $75,000.00.

We illustrate this potential error by comparing the judgment amount arrived at by the dissolution court with the judgment amount reached if we *first* calculated an equalizing payment without adjusting for Mary's half of the wages owed and *then* adjust for her $75,000 liability for her share of David's wage.

The court made the following calculation.

H (Husband's assets' value) + W1 (Wife's assets' value) = T (total assets)
.55T = W2 (Wife's intended value allocation)
W2 – W1 = E (equalizing payment)

Applying the numbers used by the court, this was

$655,483.00 + $399,500.00 = $1,054,983.00
$1,054,983.00 x 55% = $580,240.65
$580,240.65 - $ 399,500.00 = <u>$180,740.65</u> equalizing payment, which (rounded) was used as the judgment amount.

44

Had the trial court *first* determined the equalizing payment and *then* adjusted the

payment by the $75,000 of David's salary owed by Mary, the equalizing payment would

have been calculated as follows:

$730,483.00 + $399,500.00 = $1,129,983.00
$1,129,983.00 x 55% = $621,490.65
$621,490.65 - $399,500.00 = $221,990.65 equalizing payment.

*This would not be the judgment amount.* Instead, to arrive at the judgment
amount, the equalizing payment would be reduced by the $75,000.00 share of
David's salary that was owed by Mary. The equalizing payment of $221,990.65
to Mary, less the $75,000.00 share of David's wage owed by her, produces a
judgment amount for Mary of $146,990.65 ($221,990.65 - $75,000.00).

As further evidence that the trial court treated the $75,000.00 David should receive

from Mary as an amount she is permitted to share with him, one can look at the

difference between the trial court's approach and our own and consider what explains the

difference. The difference between what would have been the trial court's unrounded

judgment in Mary's favor of $180,740.65 and our calculation of a judgment amount of

$146,990.65 is $33,750.00 ($180,740.65 - $146,990.65). $33,750.00 is 45 percent

(rounded) of $75,000.00. Again, this probably results from the trial court's method of

calculation requiring David to share 45 percent of the one-half of his salary owed by

Mary.

Even if the dissolution court committed an arithmetic error, the court need not

amend the judgment if satisfied that its disposition of the parties' assets remains just and

equitable. RCW 26.09.080. Nevertheless, we wish to acknowledge for David that the

trial court's calculation of the equalizing payment likely deprived him of the salary amount the trial court intended to award him. Therefore, we remand for the dissolution court to consider this anomaly and amend the judgment if deemed suitable.

*Issue 5: Whether the trial court awarded Mary Carlson excessive spousal maintenance from David Carlson?*

*Answer 5: We decline to address this error since David provided no citation to authorities in his brief's argument with regard to this assignment of error.*

David Carlson asserts that the dissolution court granted excessive maintenance to Mary. Nevertheless, David does not expressly assign error to some award. Thus, we assume he only argues that the amount should be decreased rather than vacated entirely. David identifies no amount of maintenance that he would consider reasonable.

David Carlson presented a two-page argument in his opening brief in support of his contention that spousal maintenance exceeded a reasonable sum. Nevertheless, the argument contained no citation to legal authorities as to factors a court should consider when assessing spousal maintenance. This court does not review errors alleged but not argued, briefed, or supported with citation to authority. RAP 10.3; *Valente v. Bailey*, 74 Wn.2d at 858; *Avellaneda v. State*, 167 Wn. App. at 485 n.5.

*Issue 6: Whether the trial court erred when solely assigning the 2012-2013 debt owed to HMD to David Carlson?*

*Answer 6: We decline to address this error since David provided no citation to*

*authorities in his brief's argument with regard to this assignment of error.*

The dissolution court granted David Carlson all interest in HMD. The court also assigned to David all debt owed by the marital couple to HMD. David assigns error to this ruling. Nevertheless, in the argument section of his brief, he presents only a one-page analysis without any citation to legal authority. This court does not review errors alleged but not argued, briefed, or supported with citation to authority. RAP 10.3; *Valente v. Bailey*, 74 Wn.2d at 858 (1968); *Avellaneda v. State*, 167 Wn. App. at 485 n.5 (2012).

*Issue 7: Whether the trial court awarded Mary Carlson reasonable attorney fees and costs disproportionately to David Carlson's intransigence?*

*Answer 7: No.*

David Carlson next assigns error to the amount of attorney fees and costs the dissolution court ordered him to pay to Mary for his intransigence as being disproportionate to his misconduct. In the assignment of error, he does not expressly state that he engaged in no intransigence or that the dissolution court should not have awarded any fees. Nevertheless, in the body of his argument, he challenges the finding of intransigence. Unlike some other assignments of error, David presents legal authority in support of his argument of disproportionality.

RCW 26.09.140 declares, in part:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.

A trial court has discretion to award attorney fees in a dissolution action after considering the financial resources of both parties and determining that one party has a need and the other party has the ability to pay. *In re Marriage of Buchanan*, 150 Wn. App. 730, 739, 207 P.3d 478 (2009). When considering an award of attorney fees under this statute, the trial court generally must balance the needs of the party requesting the fees against the ability of the opposing party to pay the fees. *Bay v. Jensen*, 147 Wn. App. 641, 660, 196 P.3d 753 (2008).

The dissolution court need not balance needs and ability of the spouses if the court finds one party to be intransigent. *In re Marriage of Foley*, 84 Wn. App. 839, 846, 930 P.2d 929 (1997); *Bay v. Jensen*, 147 Wn. App. at 660. Intransigence, in this context, includes foot dragging, obstruction, filing repeated, frivolous, or unnecessary motions, noncompliance with discovery requests, or making the trial unduly difficult and costly by one's actions. *Wixom v. Wixom*, 190 Wn. App. 719, 725, 360 P.3d 960 (2015); *Bay v. Jensen*, 147 Wn. App. at 660. Fees incurred due to intransigence should be segregated from the rest of the fees. *In re Marriage of Crosetto*, 82 Wn. App. 545, 565, 918 P.2d

954 (1996).

Determining intransigence is necessarily factual. *Wixom v. Wixom*, 190 Wn. App. at 725. We review attorney fee awards based on intransigence for an abuse of discretion. *Wixom v. Wixom*, 190 Wn. App. at 725. Discretion is abused when the court's decision is outside the range of acceptable choices or based on untenable grounds or untenable reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

The evidence amply supports the trial court's finding of intransigence by David Carlson. A handwriting expert opined that David forged documents purporting to remove Mary as general partner of HMD. David developed a new orchard in violation of the interim farming order and diverted $300,000 in community funds into that project. David made unusual prepayments of $221,350 for packing expenses in an attempt to conceal proceeds. David hid income received from fruit packers.

Our review of the amount of the attorney fees award is also for abuse of discretion. *See In re Marriage of Kaplan*, 4 Wn. App. 2d 466, 488, 421 P.3d 1046, *review denied*, 191 Wn.2d 1025, 428 P.3d 1184 (2018). The trial court awarded only $50,000 of the $183,363.47 requested by Mary. Of the fees and costs requested, $33,929.55 were charges of Matt Peterson and James Tarver, respectively the forensic accountant and the document expert. We agree that the costs were reasonably incurred as a result of the intransigence of David. That leaves $16,070.45 of costs and fees awarded by the trial court. Mary fails to isolate for this court the amount of reasonable attorney fees incurred

because of intransigence. Therefore, we would remand for a further determination of fees if the court based the award of fees only on intransigence.

The dissolution court also awarded reasonable attorney fees and costs of $50,000 partially based on Mary's needs and David's abilities. David fails to recognize this alternative basis for the award. As already analyzed when discussing the separate property awarded to David and the current needs of Mary, David had more ability and Mary more need. The trial court did not abuse its discretion when awarding Mary an additional $16,070.45 because of her needs.

David Carlson contends Mary incurred attorney fees and costs primarily due to her own unreasonable and vexatious multiplication of proceedings. He contends the trial court, during its September 2015 oral ruling, stated that Mary also engaged in conduct that could be called intransigent. Nevertheless, the dissolution court made no such finding. The court mentioned that Mary annoyed and frustrated David, but the court never blamed Mary for this frustration and annoyance. A husband typically grows irritated with the conduct of a divorcing wife without her engaging in any blameworthy conduct.

Mary Carlson Appeal

*Issue 8: Whether the dissolution court abused its discretion by awarding Mary Carlson only $3,000 per month in spousal maintenance?*

*Answer 8: No.*

We previously declined to address David Carlson's assignment of error that the trial court abused its discretion when awarding Mary $3,000 in monthly spousal maintenance for three years. David failed to provide any legal citations supporting his assignment. We now address the flip side of David's assignment of error. Mary assigns error to the ostensible low amount and the purported short length of the maintenance.

Mary argues that the dissolution court failed to consider the twenty-three-year length of the marriage and her needs when it set monthly maintenance at $3,000 for only three years and required her to pay $1,000 per month in premiums for David's life insurance. Because of the premium payment, Mary receives net maintenance of $2,000 per month, but will reap only fifty percent of the insurance death benefit. According to Mary, the court should have awarded no less than $3,000 per month until at least her retirement. She contrasts David's monthly income, including $6,500 as a consultant, $2,400 from Social Security, $1,200 in retirement benefits, and farming income of at least $1,237.90. Of course, David contends the dissolution court should not have awarded any sum.

RCW 26.09.090 controls an award of spousal maintenance and declares:

(1) In a proceeding for dissolution of marriage . . . , the court may grant a maintenance order for either spouse. . . . The maintenance order shall be in such amounts and for such periods of time as the court deems just, without regard to misconduct, after considering all relevant factors including but not limited to:
(a) The financial resources of the party seeking maintenance, including separate or community property apportioned to him or her, and

51

his or her ability to meet his or her needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party;

(b) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find employment appropriate to his or her skill, interests, style of life, and other attendant circumstances;

(c) The standard of living established during the marriage or domestic partnership;

(d) The duration of the marriage or domestic partnership;

(e) The age, physical and emotional condition, and financial obligations of the spouse or domestic partner seeking maintenance; and

(f) The ability of the spouse or domestic partner from whom maintenance is sought to meet his or her needs and financial obligations while meeting those of the spouse or domestic partner seeking maintenance.

A just award, in light of the statutory factors, poses the only limitation on the amount and duration of maintenance. *In re Marriage of Bulicek*, 59 Wn. App. 630, 633, 800 P.2d 394 (1990). We rarely change on appeal trial court decisions in marital dissolution proceedings. *In re Marriage of Stenshoel*, 72 Wn. App. 800, 803, 866 P.2d 635 (1993). The party who challenges a maintenance award must demonstrate that the trial court manifestly abused its discretion. *In re Marriage of Washburn*, 101 Wn.2d 168, 179, 677 P.2d 152 (1984).

We adopt Mary's argument that she only receives $2,000 per month for three years because she must monthly pay $1,000 for an insurance premium on David's life. Still, the dissolution court did not abuse its discretion when awarding this alternative amount. In addition to maintenance, Mary received a substantial transfer payment. The court ordered David Carlson to pay Mary $180,740, with $100,000 of that amount to be

paid within months of the dissolution decree. This payment would allow Mary to pay her nominal expenses for years. In addition, Mary received income producing property. She represented to the court her competence and an ability to "make it on her own." CP at 304.

Mary Carlson cites *In re Marriage of Bulicek*, 59 Wn. App. 630 (1990) and *In re Marriage of Williams*, 84 Wn. App. 263, 927 P.2d 679 (1996), wherein the dissolution court awarded the wife maintenance until the age of retirement. Nevertheless, neither decision compels a trial court to award maintenance until the wife's retirement. We hold that the trial court did not abuse its discretion when awarding the amount and length of spousal maintenance.

*Issue 9: Whether the dissolution court abused its discretion by awarding Mary Carlson only $50,000 in attorney fees and costs?*

*Answer 9: No.*

We address the opposite side of the coin to David Carlson's contention that the dissolution court erred when granting Mary an award of $50,000 in fees and costs. Mary sought recovery of $186,363.47 in reasonable attorney fees and costs. She contends the trial court abused its discretion by awarding her less than one-third of the requested amount of attorney fees. She posits that she faced an extraordinary burden to protect her right to a fair division of property because of David's foot-dragging, fraudulent preparation of a document, concealment of fruit proceeds, duplicitous diversion of funds,

and prepayment of expenses.  Since David contends the trial court should have denied

Mary any fees, he agrees that the court reasonably limited the amount to $50,000.

We already outlined the law when we addressed David's appeal.  A trial court has

discretion to award attorney fees in a dissolution action after considering the financial

resources of both parties and determining that one party has a need and the other party

has the ability to pay.  *In re Marriage of Buchanan*, 150 Wn. App. at 739 (2009).  When

considering an award of attorney fees under this statute, the trial court generally must

balance the needs of the party requesting the fees against the ability of the opposing party

to pay the fees.  *Bay v. Jensen*, 147 Wn. App. at 660 (2008).

The dissolution court need not balance needs and ability if the court finds one

party to be intransigent.  *In re Marriage of Foley*, 84 Wn. App. at 846 (1997); *Bay v.*

*Jensen*, 147 Wn. App. at 660.  Intransigence, in this context, includes foot dragging,

obstruction, filing repeated, frivolous, or unnecessary motions, noncompliance with

discovery requests, or otherwise making the trial unduly difficult and costly by one's

actions.  *Wixom v. Wixom*, 190 Wn. App. at 725 (2015); *Bay v. Jensen*, 147 Wn. App. at

660.  Fees incurred due to intransigence should be segregated from the rest of the fees.  *In*

*re Marriage of Crosetto*, 82 Wn. App. at 565 (1996).  We note review of the amount of

the attorney fees award is also for abuse of discretion.  *See In re Marriage of Kaplan*, 4

Wn. App. 2d at 488 (2018).

As already discussed, ample evidence supports the dissolution court's finding of intransigence on the part of David Carlson. As a result, the dissolution court ordered David to pay an amount that included at least the expert witness fees incurred by Mary. The court awarded an additional sum of $21,848.10 beyond the expert fees, which amount we attribute to attorney fees rather than costs. Mary asked for $158,211.57 in counsel fees. Mary fails to direct us to any portion of the record where she segregated the amount of attorney fees incurred as a result of the intransigence of David. Therefore, we cannot conclude that the court failed to include a reasonable sum for intransigence. We also note that we find no decision that requires the trial court to award the opposing party an award for all fees and costs directly resulting from intransigence.

The trial court also granted Mary Carlson reasonable attorney fees and costs on the basis of RCW 26.09.140 in that Mary had some need for financial assistance and David had a greater ability to pay. Despite this finding, we reason that the trial court could have, within its discretion, denied any award to Mary based on need. To repeat our comments regarding the award of spousal maintenance, Mary received a substantial transfer payment. Mary received income producing property. She represented to the court her competence and an ability to support herself. If the dissolution court possessed discretion to deny fees altogether because of an alleged need, the court did not abuse its discretion when awarding only $21,848.10 in fees based on this reason.

*Issue 10: Whether the dissolution court abused its discretion when treating HMD as separate property of David Carlson?*

*Answer 10: No.*

In its distribution of the marital property, the trial court awarded all interest in HMD, valued at $1 million, to David, less the $65,000 awarded to Mary and $216,654 owed to HMD. The court noted that Mary held a 6.5 percent interest in HMD such that the court added the sum of $65,000 for David to pay Mary as part of the transfer payment.

Mary complains that the dissolution court characterized her 6.5 percent interest in HMD as community property and David's interest in HMD as separate property. Mary considers these differing characterizations as inconsistent and thus an abuse of discretion. Mary also complains that the dissolution court inconsistently characterized the parties' interest in South 80 Orchards as community property while primarily designating the interest in HMD as David's separate property.

We question the relevance of the characterization of the parties' respective interests since the trial court equitably awarded the spouses' assets among them. Again, the nature of the property is only one factor to be weighed by the trial court. Nevertheless, to the extent that the trial court deemed David's interest in HMD to be separate property and Mary's interest in the limited partnership to be community property, we find no error.

The only law cited by Mary for this assignment of error is the general proposition that a trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *In re Marriage of Littlefield*, 133 Wn.2d at 46-47 (1997). In turn, Mary argues no legitimate reason justified the dissolution court treating the respective spouses' interest in HMD differently.

Mary Carlson's analysis fails to note the history of HMD. The partnership began primarily as the entity of Hugh Carlson, David's father. When the partnership commenced in 1999, Hugh owned a 98 percent interest in the partnership. Thereafter, Hugh serially transferred limited percentages in HMD to David and David's sister. The trial court could reasonably conclude, based in part of partnership agreement addenda, that the transfers were gifts from a parent to a child and thus separate property of David. Separate property is property owned by a spouse before marriage, or acquired by him or her during marriage by gift, bequest, devise, descent, or inheritance. RCW 26.16.010. Once Hugh died, David inherited the remaining interest of his father in the partnership, and David would also hold these shares as separate property.

After Hugh's death in 2000, HMD drafted another addendum that gave the Estate of Hugh a 2.5 percent share as a general partner and an 80 percent share as a limited partner; Mary Carlson, as her separate estate, a 2.5 percent share as a general partner; Marla Contini a 2.5 percent as a general partner; and the remaining 12.5 percent share as a limited partner interest in Marla's family and David's son, Nicholas. Thus, by 2000,

57

David, in his capacity as personal representative of his father's estate, controlled an 82.5 percent share in HMD.

The history behind HMD shows that David received most, if not all, of his interest in the limited partnership as a gift from his father or through an inheritance from his father. Thus, the dissolution court characterized the interest as David's separate property. *See In re Marriage of Urbana*, 147 Wn. App. 1, 11, 195 P.3d 959 (2008).

We note that the HMD partnership agreement addendum listed Mary's share in the partnership as her separate property. Nevertheless, the trial court was not bound by the document's characterization of ownership. The trial court was free on its own to decide the character of the ownership interest and could characterize Mary's interest as community property since she received the interest during the marriage. Mary does not argue to the contrary.

The dissolution court also did not abuse its discretion when treating South 80 Orchards as community property and HMD as primarily David's separate property. Evidence supported the court's finding that Mary commingled South 80 Orchards' assets with assets of community property. In turn, evidence supported the trial court's finding that David did not commingle HMD assets with community property assets.

*Issue 11: Whether the dissolution court abused its discretion when treating the postseparation debt owed to HMD as a community liability rather than David's separate debt?*

58

*Answer 11: No.*

Mary next assigns error to the dissolution court's ruling that postseparation debt to HMD constituted a community liability for both spouses. She emphasizes that David prepared and signed the notes as both maker and payor. She never agreed to the loans. According to Mary, the trial court should have characterized the debt as David's separate liability and should not have deducted the loan amount of $216,654 against the total value of the community property for purposes of dividing the assets between the spouses in the 55 percent to 45 percent split.

Mary Carlson cites RCW 26.16.140 to support this assignment of error. The first sentence of the statute reads:

> When spouses or domestic partners are living separate and apart, their respective earnings and accumulations shall be the separate property of each.

We conclude that the statute does not apply since the statute refers only to earnings and accumulations, not debts or liabilities. We refuse to apply the statute by analogy to debts in this instance because of the unique circumstances involved. An interim court order directed David Carlson to manage all of the farm community property. Evidence supports a finding that the debt to HMD incurred after separation assisted in the community orchard operations.

The presumption of community liability for debts incurred during the marriage may be overcome in circumstances before a dissolution decree when the couple live

separate and apart. *Oil Heat Co. of Port Angeles v. Sweeney*, 26 Wn. App. 351, 353-54, 613 P.2d 169 (1980). Whereas, David and Mary Carlson lived apart from each other, Mary did not overcome the presumption of community liability when David managed the community orchards. Therefore, the trial court did not abuse its discretion when attributing the debt to the community.

*Issue 12: Whether the dissolution court abused its discretion when assessing interest on the funds Mary withdrew from the HMD bank account and later placed in the court registry?*

*Answer 12: No.*

The trial court assessed interest at twelve percent per annum on the $226,485.05 Mary Carlson withdrew from the HMD bank account on November 19, 2013 and placed into the registry of the court on January 7, 2014. The amount of interest accrued was $3,648.56.

Mary Carlson contends the HMD funds that the trial court ordered deposited with the registry of the court were not liquidated until the court determined the value of Mary's 6.5 percent interest in HMD. Therefore, according to Mary, prejudgment interest was not appropriate. We disagree. The dissolution court did not impose interest on the value of Mary's share of ownership of HMD. The court assessed interest on the money withdrawn from the HMD bank account. That amount was readily known and thus liquidated.

Generally, a prevailing party is entitled to prejudgment interest if the amount claimed is liquidated. *In re Marriage of Rockwell*, 157 Wn. App. 449, 454, 238 P.3d 1184 (2010). A claim is liquidated if data in the evidence makes it possible to compute the amount with exactness, without reliance on opinion or discretion. *In re Marriage of Rockwell*, 157 Wn. App. at 454. Prejudgment interest is compensation for the loss of the use of those funds. *In re Marriage of Rockwell*, 157 Wn. App. at 454.

*Issue 13: Whether the dissolution court abused its discretion when awarding David Carlson all of the parties' non-leased real property, residences, and shops?*

*Answer 13: No.*

Mary observes that the dissolution court intended to divide the couple's orchard properties so that both parties could continue to farm. Nevertheless, the court granted to David all of the couple's orchard land owned outright and assigned her the three leased Native American trust properties. The court also denied her a useable residence and a shop for farm equipment. From these observations, Mary contends the dissolution court failed to properly consider the economic circumstances of the parties. Mary requests an award of the HomePlace property so she has a residence and a shop in which to store all of her farm equipment.

When previously addressing David's challenge to the property division, we reviewed the factors a court considers when allocating the marital couple's property. As stated, our review of the trial court's distribution of property is for abuse of discretion. *In re*

*Marriage of Muhammad*, 153 Wn.2d at 803 (2005). An obvious disparity in the economic condition of the parties after the award may show an abuse of the court's discretion. *In re Marriage of Kim*, 179 Wn. App. at 253 (2014).

We know of no rule that requires the court, in a situation the same or similar to the economic conditions of the Carlsons, to award each party at least some of the fee land, a residence, and a large shop. Therefore, we find no abuse of discretion by the trial court for many reasons. Mary received 225 acres of orchard to David's 210 acres of orchard. The value of the wind machines on her leased land exceeded the value of the wind machines on David's land. She received an equalization payment from David such that she received 55 percent of the community property. She also receives spousal maintenance.

## HMD Appeal

*Issue 14: Whether David's trial testimony affirming responsibility for loans purportedly issued by HMD to Carlson Agribusiness in 2003, 2007, and 2009 precludes application of a three-year statute of limitations to HMD's debt collection action against South 80 Orchards?*

*Answer 14: No.*

We move to HMD's assignments of error. In December 2013, HMD sued South 80 Orchards to collect on the loans issued in 2003, 2007, and 2009. In 2003 and 2007, Mary Carlson wrote checks on HMD's account totaling $153,400 to South 80 Orchards

to cover shortages in the latter's operating funds. South 80 Orchards signed no promissory note. In 2009, Mary wrote three checks totaling $165,000 on HMD's account to South 80 Orchards as working capital for the orchard. The 2009 checks contain the abbreviation "N/P S-80," which may be shorthand for "note payable South 80." CP at 292.

In the dissolution court's oral ruling, the court mentioned that David Carlson and Carlson Agribusiness, not South 80 Orchards, borrowed the HMD funds in 2003 and 2007. Nevertheless, Mary testified that HMD loaned the money to South 80 Orchards, not David or Carlson Agribusiness. David cites no evidence contradicting Mary's testimony identifying the borrower. David presumably would rather the loans be assessed to South 80 Orchards, than him personally. Thus, we proceed on the supposition that South 80 Orchards was the sole borrower in 2003 and 2007. HMD sues South 80 Orchards, not David Carlson or Carlson Agribusiness, for the debt. The trial court concluded that South 80 Orchards borrowed the 2009 funds.

No attorney has appeared for South 80 Orchards in this appeal to argue against enforcement of the debt. We suspect that HMD seeks to impact Mary more than it seeks to impact South 80 Orchards by its collection efforts, since its appeal argument focuses on Mary. In fact, HMD wrongly contends that the trial court pierced South 80 Orchards' corporate veil so as to impose individual liability for the debt on Mary and the

community.  Mary seeks to defeat the debt collection suit.  Still neither David nor Mary Carlson guaranteed the 2003, 2007, or 2009 debt.

We question the utility of any suit to collect the loans.  Assuming Mary is indirectly obligated to pay any of the debt owed to HMD, David holds the same liability, since the trial court ruled that South 80 Orchards constitutes community property.  As part of the dissolution action, the trial court could assign the entire debt to be paid by David, who owns and controls HMD.  Or the dissolution court could impose the debt in part on Mary, but increase her portion of the property division or increase her spousal maintenance in order to assist her in retiring the debt.  In its oral ruling, the dissolution court suggested that, assuming the court enforced the debt, it would impose the debt on David without offsetting the property award to Mary.

The trial court held the three-year statute of limitations barred HMD's debt collection or breach of contract claim against South 80 Orchards.  We agree.

A suit on a written contract generally must be commenced within six years. RCW 4.16.040(1).  A three-year limitation period applies to a contract not in writing. RCW 4.16.080(3).  When a claimant must rely on parol evidence to establish any material element of a contract, the law deems the contract an oral agreement and subject to the three-year statute of limitations.  *Barnes v. McLendon*, 128 Wn.2d 563, 570, 910 P.2d 469 (1996).  An account does not satisfy the writing requirement of the statute. *Hamlin v. Flick*, 130 Wash. 126, 130, 226 P. 484 (1924).

No writing confirms the 2003 and 2007 loans to South 80 Orchards. HMD does not contend that the notation on the 2009 checks removes the claim on the 2009 loans from the three-year limitation period.

HMD claims the three-year limitation period does not bar its suit because David Carlson, one of the general partners in South 80 Orchards, acknowledged the debt during his trial testimony. We disagree for numerous reasons.

First, we repeat David Carlson's trial acknowledgment of debt:

> Q Now as you sit here today, chief executive of Carlson Agribusiness, you acknowledge that those amounts are still owing to HMD.
> A Correct.
> Q You're acknowledging the debt right here, right now, correct?
> A Correct.

RP (June 17, 2015) at 566. Any admission of David on behalf of Carlson Agribusiness has no binding effect on South 80 Orchards. HMD cites no testimony of David whereby he conceded a debt owed by South 80 Orchards.

Second, under Washington statute any new promise to pay a debt must be in writing and signed by the debtor. RCW 4.16.280 declares:

> No acknowledgement or promise shall be sufficient evidence of a new or continuing contract whereby to take the case out of the operation of this chapter, unless it is contained in some writing signed by the party to be charged thereby.

HMD contends David's testimony in court satisfied the writing requirement of RCW 4.16.280. Nevertheless, assuming trial testimony may be deemed a "writing," David has never signed the testimony.

Third, in support of its argument that David's trial testimony satisfies the writing requirement, HMD cites *Powers v. Hastings*, 20 Wn. App. 837, 846, 582 P.2d 897 (1978), *aff'd on other grounds*, 93 Wn.2d 709, 612 P.2d 371 (1980). *Powers*, however, held that trial testimony could remove an oral lease and option to purchase real property from the statute of frauds, not the operation of a statute of limitations. HMD cites no law that establishes that trial testimony fulfills the written and signed acknowledgment statute. In *Miwon, U.S.A., Inc. v. Crawford*, 629 F. Supp. 153, 156 (S.D.N.Y. 1985), the federal court ruled that trial testimony did not meet the requirements of the New York statute that also required a signed writing to avoid the statute of limitations.

Fourth, HMD sued South 80 Orchards on the original debt, not on David Carlson's acknowledgment of the debt. When a debt is acknowledged before the statutory period, the resulting legal action must be on the original debt or on the paper evidencing it. *In re Receivership of Tragopan Properties, LLC*, 164 Wn. App. 268, 273, 263 P.3d 613 (2011). When a debt is acknowledged after the statute of limitations has run, the action must be on the new agreement. *In re Receivership of Tragopan Properties, LLC*, 164 Wn. App. at 274. To collect on David Carlson's renewed promise, HMD needed to file a new suit or amend its intervention complaint against South 80 Orchards to seek payment

66

on the new pledge.

Fifth, David acknowledged the debt but never renewed a pledge to pay the loan. Washington cases conflict on whether the debtor must go beyond an acknowledgment and also pledge to pay the amount of the loan. Most cases hold that the debtor must renew the promise to pay. *Dolby v. Fisher*, 1 Wn.2d 181, 95 P.2d 369 (1939); *Addison v. Stafford*, 183 Wash. 313, 48 P.2d 202 (1935); *Beckman v. Alaska Dredging Co.*, 180 Wash. 321, 40 P.2d 117 (1935); *Temirecoeff v. American Express Co.*, 172 Wash. 409, 20 P.2d 23 (1933); *Tucker v. Guerrier*, 170 Wash. 165, 15 P.2d 936 (1932); *In re Receivership of Tragopan Properties, LLC*, 164 Wn. App. at 273-74. One case to the contrary is *Cannavina v. Poston*, 13 Wn.2d 182, 124 P.2d 787 (1942).

Sixth, David Carlson acknowledged the debt not in order to require South 80 Orchards to pay, but in an attempt to impose the debt on Mary. As a general rule an acknowledgment or part payment by a joint debtor does not suspend the statute of limitations as to the other debtor, unless he or she authorizes or ratifies the payment or acknowledgment. *Matson v. Weidenkopf*, 101 Wn. App. 472, 479, 3 P.3d 805 (2000). In accordance with this principle, one spouse's acknowledgment of the debt cannot bind the other spouse unless the latter gives authority to the former to speak on behalf of the community. *Matson v. Weidenkopf*, 101 Wn. App. at 480-81.

*Issue 15: Whether the statute of limitations bars HMD's suit against Mary for breach of a fiduciary duty when distributing HMD money to South 80 Orchards and*

*when asserting the statute of limitations?*

*Answer 15: We decline to address this question because HMD did not plead a cause of action against Mary Carlson based on her distributing the loan funds and her assertion of the statute of limitations.*

On appeal, HMD argues that Mary Carlson breached her fiduciary duty by using HMD's money for her own profit in 2003, 2007, and 2009 by converting money to South 80 Orchards without disclosure to the other partners, the Contini family. HMD further contends that Mary's failure to disclose the loans to the Continis tolls the running of the statute of limitations from accruing on HMD's claims against her or against South 80 Orchards.

We note that David, who has inherited nearly the entire ownership in HMD, does not personally contend that he lacked knowledge of the loans. He benefitted from the loans as much as Mary did since the loans paid orchard expenses. We also note that the Continis, David's sister and her family, do not complain about the unpaid loans issued by HMD to South 80 Orchards. The Contini family also inherited an interest in HMD through Hugh Carlson, and the family also likely would have wished David's orchard operation to be successful.

HMD seeks to impose sole fiduciary responsibility on Mary by quoting testimony that she controlled South 80 Orchards. Remarkably, David then claims that he, by his testimony can bind South 80 Orchards because he was also a general partner in the entity.

Finally, we note that David fraudulently sought to erase Mary's interest in HMD, but now he claims that Mary owed a fiduciary duty to HMD. We question the cleanliness of David's, and, in turn, his company HMD's, hands.

We decline to address HMD's arguments to impose fiduciary responsibilities on Mary because of the loans to South 80 Orchards because HMD did not plead this claim. In the intervenor action, HMD complained that Mary violated her fiduciary duty but only alleged as a factual basis the withdrawal of funds from the HMD bank account in November 2013.

Although courts generally construe pleadings liberally, the civil rules require that a party's pleadings give notice that advises the other party of the event being sued upon. *North Coast Enterprises, Inc. v. Factoria Partnership*, 94 Wn. App. 855, 861, 974 P.2d 1257 (1999). HMD gave no notice that it sued based on the events of failing to notify the Contini family of the loans and asserting the statute of limitations.

HMD may contend that, despite it not pleading these additional claims of breach of fiduciary duty, the trial court entertained the claims, and, thus, this court should address the claims on review. We recognize that the court impliedly ruled that Mary breached no fiduciary duty in addition to the ruling that the statute of limitations bars any suit for a breach. We further recognize that the trial court can amend a party's pleading to conform to the evidence. At the discretion of the trial court, the pleadings may be amended to conform to the evidence at any stage in the action, including at the

conclusion of a trial, and even after judgment. CR 15(b); *Green v. Hooper*, 149 Wn. App. 627, 636, 205 P.3d 134 (2009). Nevertheless, an amendment under CR 15(b) cannot be allowed if actual notice of the unpleaded issue is not given, if there is no adequate opportunity to cure surprise that might result from the change in the pleadings, or if the issues have not in fact been litigated with the consent of the parties. *Harding v. Will*, 81 Wn.2d 132, 137, 500 P.2d 91 (1972); *Mukilteo Retirement Apartments, LLC v. Mukilteo Investors LP*, 176 Wn. App. 244, 256-57, 310 P.3d 814 (2013).

HMD cites to no portion in the trial record whereat the trial court deemed the intervenor complaint amended to include additional claims against Mary Carlson for breach of fiduciary duty. HMD cites to no law and provides no analysis for this court as to why the court should deem the complaint amended to include a claim for breach of fiduciary duty based on the failure to inform the Continis of the loans to South 80 Orchards and the assertion of the statute of limitations. HMD does not even reference CR 15(b) in its briefing.

*Issue 16: Whether the trial court should have ordered Mary to pay interest on the HMD funds deposited in the registry of the court during the time that the funds reposed in the registry?*

*Answer 16: No.*

In January 2014, the dissolution court ordered Mary Carlson to deposit into the court registry the $226,485.05 that she withdrew from HMD. As part of the dissolution

decree, the trial court ordered Mary to pay interest on the $226,485.05 amount from the date she withdrew the funds from the bank account to the date she placed the funds in the court registry. Nevertheless, the court refused to require Mary to pay interest on the sum during the time the large amount sat in the court registry. HMD argues that, by placement of the money in the registry, Mary wrongly denied HMD use of the money for months and thus she should pay interest on the sum until the court ordered return of the money to HMD. The amount of interest due on the distrained funds at twelve percent interest from January 8, 2014 to September 25, 2015 is $46,538.02.

A party is entitled to prejudgment interest on liquidated claims to compensate them for loss of use on money that is wrongfully withheld by another party. *Mall Tool Co. v. Far West Equip. Co.*, 45 Wn.2d 158, 169, 273 P.2d 652 (1954); *TJ Landco, LLC v. Harley C. Douglass, Inc.*, 186 Wn. App. 249, 256, 346 P.3d 777 (2015). A court may award prejudgment interest when the claimed amount is "liquidated." Liquidated means, in this context, the amount can be computed with exactness from the evidence, without reliance on an opinion or discretion. *Forbes v. American Building Maintenance West*, 170 Wn.2d 157, 166, 240 P.3d 790 (2010).

We agree with HMD that the sum was liquidated. We disagree that HMD was entitled to prejudgment interest. The trial court did not find that Mary Carlson wrongly withheld the funds from HMD after the deposit of the funds into the court registry.

71

*Issue 17: Whether this court should grant Mary reasonable attorney fees and costs on appeal.*

*Answer 17: Yes, but only as to fees and costs incurred by reason of David's intransigence.*

Mary Carlson requests reasonable attorney fees and costs under RCW 26.09.140 and RAP 18.1 based on her need and David's ability to pay as well as David's continued intransigence. RAP 18.1. This court also has discretion to award fees and costs on appeal based on a showing of intransigence or need. *In re Marriage of Buchanan*, 150 Wn. App. at 740 (2009).

Because Mary's request for fees based on her need and David's ability requires consideration of the financial resources of the parties, she must have filed an affidavit of need no later than 10 days before oral argument. RAP 18.1(c). She failed to do so. Therefore, we deny any award under RCW 26.09.140.

We grant Mary Carlson reasonable attorney fees and costs on appeal to the extent the fees were incurred were related to the forms of intransigence found by the dissolution court. In filing her application for fees, Mary shall hold the burden of isolating those fees related to the intransigence.

## CONCLUSION

We compliment the dissolution court on its handling of this difficult dissolution proceeding consolidated with commercial litigation. We affirm all rulings of the

No. 34443-6-III
*In re Marriage of Carlson*

dissolution court, except as to the calculation of salary to be credited to David Carlson. We remand to the trial court to review the potential calculation error. We grant Mary Carlson reasonable attorney fees and costs on appeal to the extent she attributes the expenses to the intransigence found by the dissolution court.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Pennell, A.C.J.

_____
Siddoway, J.

73